MOUNT HERMON BOYS' SCHOOL *vs.* INHABITANTS OF GILL.

Franklin.    Sept. 29. — Oct. 20, 1887.    C. ALLEN & HOLMES, JJ.,
absent.

An institution organized under the Pub. Sts. *c.* 115, for the education of boys, owned a large farm, on which were the school buildings, two farm-houses, barns, and other buildings adapted for farm purposes, and live stock. The scholars, in addition to attending school, were required to work on the farm two or three hours a day, and were taught agriculture. The price of board and tuition was $100 a year for each scholar. The products of the farm and the live stock were for the most part consumed in furnishing food for the scholars, but others were sold or bartered and the proceeds applied to the maintenance of the school. *Held*, that, under the Pub. Sts. *c.* 11, § 5, *cl.* 3, the whole of the property of the institution was exempt from taxation.

CONTRACT, in two counts. The first count was to recover $175.26, the amount of a tax assessed upon the real estate and personal property of the plaintiff on May 1, 1884, and paid under protest. The second count was to recover $179.79, the amount of a similar tax assessed on May 1, 1885, and also paid under protest. Answer, a general denial.

Trial in the Superior Court, without a jury, before *Brigham,* C. J., who found the following facts :

The plaintiff is an institution organized, under the Pub. Sts. *c.* 115, on May 19, 1882, for the " education of boys," and its

property consists of a farm of about four hundred acres, situate in the town of Gill, upon which are two farm-houses, barns, and other buildings adapted to farming purposes, cottages for lodgings, a building styled a recitation-hall, containing a chapel, school-rooms, library, and museum, and a building styled Crosby Hall, containing rooms for about two hundred students, and a dining-hall for the whole school. Of live stock, the property of the plaintiff, there were on the said farm oxen, horses, and swine, bred, reared, kept, and used on said farm; and all of said farm, excepting about ten acres, upon which are said school buildings and their near surroundings, and woodland, is used for tillage, pasture, and other agricultural purposes. Said corporation has no capital stock or stockholders, and has obtained its property by means of gifts of money from persons interested in the objects of the school, and such property is held and managed by fifteen persons, styled trustees, one of whom is president. There are also a vice-president, a secretary, and a treasurer. A superintendent of said farm and school, and from ten to fifteen teachers, reside on the farm.

The purpose of the school is to provide a place where young men whose early education has been neglected can be instructed, their physical welfare cared for, and a practical knowledge of work, especially in agriculture, given, by requiring of each member of the school a certain amount, usually two or three hours per day, of manual labor on said farm. The aim of the industrial arrangements is not so much to secure pecuniary benefit as to provide for physical culture, teach how to do various kinds of farm work, form habits of industry, and inculcate right views of manual labor, and especially of agriculture. No person under the age of sixteen years, or not having health, mental ability, and moral character, can be admitted into said school. Boys admitted into the school are required to pay for board and tuition, each $100 per year, payable semiannually in advance. During vacations, the scholars may have occasional employment on said farm for wages, and during terms may also do extra work, for which they are paid. The maintenance of the school depends upon the moneys received from the board and tuition of its scholars, and the products of the farm. The farm is carried on substantially by the labor of the scholars of the

school; and the products of the farm, excepting as hereinafter stated, are consumed in the school, for food of its scholars, fuel, &c. The products of the farm have been hay, corn, rye, potatoes and other vegetables, and butter and milk. The school went into operation in 1881, and has been maintained and carried on since in accordance with the purposes of its organization, as the same are herein stated.

Between May 1, 1884, and March 12, 1885, inclusive, there were sold for cash, or exchanged in barter, at current market prices, for other farm products and provisions, products and live stock of the farm to the amount and value of $1047.57, as follows: pork and live hogs, partly for cash and partly in exchange for beef, $180.47; five fat cows, not yielding milk, for cash, $160; two cows and their two calves, of imported Angus stock, on credit, of the value of $400; apples, for cash, $124.55; cucumbers, for cash, $26.30; butter, for cash, $11.75; calves, for cash, $9; calf-skins, for cash, $3.50; in barter with a girls' school at Northfield, for various farm products, $150. Cows and calves thus sold were part of the live stock kept and bred on the plaintiff's farm, and fed on its products. Of the hogs and pork thus sold on the farm, the hogs were bred, kept, and fed there upon its products, and upon swill derived from the boarding-house of the plaintiff, and were tended by the scholars. The butter and milk thus sold were the products of the cows kept on the farm and the labor of the scholars. The cucumbers and apples thus sold were also the product of the farm and the labor thereon of the scholars.

There is at Northfield, four miles from the plaintiff's school, a girls' school, to which is attached a farm, the products of which during the years 1884 and 1885 were interchanged with the products of the plaintiff's farm, at current market prices, for the mutual convenience of the two schools; and in this interchange the plaintiff furnished to the girls' school its farm products of the value of $150, and received from said girls' school its farm products of much larger amount and value, so that the balance of accounts arising out of such interchange of products was, in settlement of such accounts, always largely in favor of said girls' school. In the summer of 1885, there was a convocation of clergymen and religious persons, for religious objects,

which continued during two weeks, on the premises of said girls' school; and for milk from the plaintiff's cows on its farm, furnished to said convocation, the plaintiff received in cash the sum of $72.80.

All the products and live stock of the plaintiff's farm disposed of by sale and barter were cultivated, gathered, and tended by the labor of the plaintiff's scholars; and all moneys received from their sale came to the hands of the plaintiff's treasurer, and were applied to the maintenance of the plaintiff's school. All farm products and provisions obtained by the barter of the plaintiff's farm products were consumed in the plaintiff's school, for the subsistence of its scholars or of the live stock on the plaintiff's farm. From the time when the plaintiff's school went into operation, the products of its farm have largely increased from year to year, but have never been sufficient for the needs of the school, or of the stock on the farm.

The assessors of the defendant town, in 1884, assessed taxes upon the plaintiff's personal property, consisting of the horses, oxen, cows, and swine on said farm, valued at $2934, in the sum of $34.62, and upon the plaintiff's real estate, consisting of three hundred and twenty-three acres of the land of the said farm, and the two farm-houses, wood-house, two barns, two sheds, two tobacco barns, and milk-house, valued at $11,755, in the sum of $138.70. The defendant's bill for these taxes, amounting to $175.26, was paid to the defendant's tax collector by the plaintiff's treasurer, on February 27, 1885, after due demand, but under protest, in writing, that said taxes had been illegally assessed.

The assessors of the defendant town, in 1885, assessed taxes upon the same personal property on the plaintiff's farm, valued at $2517, in the sum of $31.69, and upon the same real estate and buildings, valued at $11,755, in the sum of $148.10, and these taxes of 1885, amounting in all to $179.79, were duly demanded by the defendant's tax collector of the plaintiff's treasurer, who paid the same, with a written protest that the same were illegally assessed. No question was made as to the sufficiency of said demands and protests.

In 1884 and in 1885, the defendant assessed no taxes on any of plaintiff's buildings on its said farm having in them rooms

used for school purposes, or for dormitories for scholars, or for eating-rooms, or for recitation-rooms, or for lodging of teachers, or on the superintendent's house, the chapel, or the library.

In 1884, the defendant owed a debt of $10,000, contracted prior to 1882 in contributing to the cost of erecting a bridge over the Connecticut River, and duly raised money by taxation in 1884, including the taxes in suit, to pay interest on said debt. The defendant at the town meeting in March, 1885, duly voted to pay and to appropriate money raised by taxation, and to pay $1000 of said debt of $10,000, and duly raised money by such taxation in 1885, including the taxes in suit.

Upon these facts the judge ruled that the action could not be maintained, and ordered judgment for the defendant. The plaintiff alleged exceptions.

*C. C. Conant*, for the plaintiff.

*J. A. Aiken*, for the defendant.   1. If any portion of the plaintiff's real estate or personal property was liable to taxation, this action cannot be maintained.   The proper remedy is an application for an abatement.   Pub. Sts. *c.* 11, § 69.   *Bourne* v. *Boston*, 2 Gray, 494, 496.   *Chapel of the Good Shepherd* v. *Boston*, 120 Mass. 212.

It certainly requires a very liberal interpretation of the statute to hold that the two tobacco barns, a part of the property for which the plaintiff claims exemption, are property appropriate for a literary, educational, charitable, scientific, or religious institution.   No taxes were assessed in 1884 or 1885 upon buildings having in them rooms used for school purposes, or for dormitories for scholars, or for eating-rooms, or for lodging of teachers, or on the superintendent's house, the chapel, or the library. The defendant seeks to hold subject to taxation only the farm and farming stock.

2. It appears in the exceptions that the defendant town, prior to the incorporation of the plaintiff, had contracted a debt in contributing to the cost of erecting a bridge over the Connecticut River; that this debt was still outstanding in 1884 and 1885; and that a portion of the taxes assessed upon the plaintiff's property, and in suit in this action, was to raise money to pay the interest upon the debt in 1884, and a part of the principal in 1885.   The real estate of every inhabitant of Gill was security

for the payment of the debt, and might have been taken upon an execution on a judgment against the town on account of this debt. *Hill* v. *Boston*, 122 Mass. 344, 349. Until this debt is paid, the real estate of the plaintiff is a part of the security holden for the town's liability, and it should bear its proportion of the money raised by taxation on account of that debt.

3. The plaintiff claims exemption from taxation under the Pub. Sts. *c.* 11, § 5, *cl.* 3. It is not entitled to avail itself of that exemption, because its property has not been occupied for the purposes for which it was organized, and because a portion of its estate has been used for other than literary, educational, benevolent, charitable, scientific, or religious purposes.

The plaintiff, during a period extending from May 1, 1884, into the summer of 1885, disposed of various products of the farm and of the farming stock, by way of sale and barter, at current market prices, to the amount of more than $1100. It is immaterial whether these products were sold, bartered, or exchanged. At law the nature and effect of the transaction are the same. *Commonwealth* v. *Clark*, 14 Gray, 367, 372. Neither can it make any difference that the other parties to the transfer were in some of the instances a girls' school of similar objects and systems, and clergymen and religious persons.

A statute which exempts property from taxation is to be strictly construed. Taxation is the rule, exemption the exception. Such special privileges are in conflict with the universal obligation of all to contribute a just proportion toward the public burden. The burden of proof is upon every person who claims exemption, to show that his case comes clearly within the exception. If any doubt arises as to the exemption, it must operate most strongly against the party claiming the exception. *Redemptorist Fathers* v. *Boston*, 129 Mass. 178.

The plaintiff, besides being a literary, benevolent, charitable, scientific, or religious institution, has been a seller of farm produce for gain. That the sales have been small is no defence; the question is not one of degree. If the plaintiff may dispose of farm produce, at current market rates, to the amount of more than $1000 during the years in question, why may it not, when the farm's productiveness is increased, dispose of $10,000 worth, or of $100,000 worth, in the same way, provided the proceeds are

used for the benefit of the school? Why, also, may it not, in furtherance of its project of furnishing an industrial education, establish, in addition to its farm, a woollen mill to clothe its pupils with wool grown upon the farm, and a shoe shop to shoe them with hides there produced, and sell the surplus products of such manufactories, and, using the proceeds for the maintenance of its school, contend that such appropriation is for literary, educational, benevolent, charitable, scientific, or religious purposes, and so the plaintiff is exempt? The statute never intended such proceedings, yet such will be the inevitable result, if the plaintiff is allowed to prevail in this action.

The plaintiff will urge that many of the products of its farm are of a perishable nature, like butter, milk, eggs, and apples, and some of them of a nature unavailable for school purposes, as the hides of animals, and that the only way for the school to utilize such products is to sell them or trade them off. The answer to this position is, that, if the plaintiff chooses in the management of its school to have an annex, like a farm, which obliges it to enter the market as a seller of goods, the plaintiff must bear the same burdens that other sellers bear, namely, pay taxes. The plaintiff is not obliged to maintain its farm.

In *Wesleyan Academy* v. *Wilbraham*, 99 Mass. 599, Chief Justice Chapman recognizes distinctly that the plaintiff's property would not have been exempt " if the plaintiffs carried on their farm and sold the produce at its market price for the use of the students, in order to make a profit as farmers or dealers in milk and vegetables."

The plaintiff must take the position, that, because the things or the money received in exchange for the plaintiff's produce were ultimately applied to the maintenance of the plaintiff's school, there is a compliance with the spirit of the statute. Such a view cannot be maintained. *Lowell Meeting-House* v. *Lowell*, 1 Met. 538. *Pierce* v. *Cambridge*, 2 Cush. 611. *Chapel of the Good Shepherd* v. *Boston, ubi supra*. *Lynn Workingmen's Association* v. *Lynn*, 136 Mass. 283.

The plaintiff, being a corporation organized for the " education of boys," is authorized to make such purchases as are necessary, but it cannot be a seller or trader of farm produce. If it chooses to put produce upon the market, it should pay taxes. To hold

otherwise is to give a bounty or subsidy to the plaintiff, enabling it to undersell neighboring producers among the inhabitants of the defendant town, whose burdens are thereby augmented by having to bear the increased taxation and competition.

KNOWLTON, J. The defendant very properly conceded, at the argument, that the plaintiff was one of the institutions to which certain exemptions from taxation were granted by the Pub. Sts. c. 11, § 5, cl. 3. The first question under this clause is whether the plaintiff's real estate which was taxed was occupied for the purpose for which the plaintiff was incorporated; and, inasmuch as the incorporation was under the general law, the second question is, under the last part of said clause, whether any portion of the taxed property, real or personal, was " used or appropri, ated " at the time of taxation " for other than literary, educa, tional, benevolent, charitable, or religious purposes."

The purpose of the plaintiff's incorporation was the " education of boys." Education is a broad and comprehensive term. It has been defined as " the process of developing and training the powers and capabilities of human beings." To educate, according to one of Webster's definitions, is " to prepare and fit for any calling or business, or for activity and usefulness in life." Education may be particularly directed to either the mental, moral, or physical powers and faculties, but in its broadest and best sense it relates to them all. The plaintiff's trustees did not exceed their authority under their certificate of incorporation when they established an institution one of whose purposes was, according to the facts found, " to provide a place where young men, whose early education has been neglected, can be instructed, their physical welfare cared for, and a practical knowledge of work, especially in agriculture, given, by requiring of each member of the school a certain amount, usually two or three hours per day, of manual labor on said farm." It appears further in the facts, that "the aim of the industrial arrangements is not so much to secure pecuniary benefit as to provide for physical culture, teach how to do various kinds of farm work, form habits of industry, and inculcate right views of manual labor, and especially of agriculture."

The plaintiff's farm consists of about four hundred acres of land, upon which, besides the buildings containing the chapel,

school-rooms, library, museum, cottages for lodging, general dormitory for two hundred pupils, and dining-hall, there are two farm-houses, barns, and other buildings adapted to farm purposes. The farm was used for tillage, pasture, and other agricultural purposes, and "oxen, horses, and swine were bred, reared, kept, and used on it." "No person under the age of sixteen years, or not having health, mental ability, and moral character, can be admitted into the school." The farm was mainly carried on by the labor of the scholars of the school, and the products of the farm were for the most part consumed in said school. The animals kept on the farm were tended by the plaintiff's scholars. During the year following May 1, 1884, products and live stock of the farm were sold for cash, or exchanged in barter at current market rates, amounting in value to $1047.57. These appear to have been articles not desired for consumption. Of this amount $400 was received for two cows of imported stock and their two calves. Pork and hogs were exchanged in part for beef, and there were other products incidental to the management of the farm, some of them perishable, which apparently were not needed for use in the school.

The use of the farm and of the personal property upon it resulted beneficially to the plaintiff in three different ways. First, it furnished for the scholars the field, objects, and materials necessary for their physical training and practical study of agriculture, in connection with manual labor and the general development referred to in the above-quoted statement of the purposes and aims of the school. Secondly, it provided food for the pupils and teachers who were in attendance, and contributed directly to the economical support of the scholars, which was an important object of the institution. Thirdly, so far as the products of the farm were sold, the plaintiff presumably obtained profit, and to that extent replenished its treasury. The use of the property to accomplish either of the first two results would be for the purpose for which the corporation was formed, within the meaning of the statute we are considering, and would leave the whole exempt from taxation; the use of it to accomplish the last would not.

To an institution of learning attempting to furnish practical education in agriculture, and to give boys physical development

by manual labor, a farm is as necessary as are chemicals and chemical apparatus to a teacher of chemistry. And a farm cannot be managed without the personal property properly appertaining to it. So, too, in connection with a boarding-school situated as this was, the corporation's use of the farm to raise provisions for its scholars is to be distinguished from the use of it to increase the funds in its treasury, and thereby enable it to do its charitable work. This distinction is well marked in *Wesleyan Academy* v. *Wilbraham*, 99 Mass. 599, and in *Chapel of the Good Shepherd* v. *Boston*, 120 Mass. 212. See also *Monticello Female Seminary* v. *People*, 106 Ill. 398.

The purpose referred to in the statute contemplates the direct and immediate result of the use of the property, and not the consequential benefit to be derived from the improvement of it. Where one of the objects of an institution of learning is charitable, and boys are required to pay only a part of the cost of their education, — as, in this case, only $100 a year for board and tuition, — the corporation may own its property, and use it directly in the education of its pupils, as well when the property is land upon which provisions are raised for their sustenance, as when it is real estate occupied by the houses in which they dwell. But if it seeks to promote its educational and charitable objects by obtaining profit from its property and filling its treasury for future use, that purpose is not within the exempting clause. The practical difficulty in cases of this kind is to ascertain the purpose for which the real estate is occupied; when that is determined, the result is reached.

In this case, the plaintiff's purpose in the use of its farm must be ascertained from its conduct, — its acts and the declarations accompanying them. Its general purposes in establishing the institution under the authority of its certificate of incorporation are very fully set forth in the facts reported. One was to teach the boys, among other things, agriculture. Another was to furnish them board and instruction at a small charge. Getting money and supplying the treasury was not one of the purposes for which the institution was founded. It was merely a means by which those purposes were to be accomplished.

Was this farm practically used to teach the boys agriculture, and give them physical training, and furnish them manual labor

as a part of their education? Was it used to furnish supplies directly to this boarding-school, and so lessen the cost of education there? Or was it, on the other hand, used to produce revenue, and earn income which might afterward be expended for the school? It seems to us that the farm and the property upon it were used in the legitimate management of the school, directly to accomplish its purposes, and not to obtain money for subsequent use in accomplishing them. The fact that products were sold is a circumstance important only so far as it characterizes the use. We think that the sales were merely incidental to a use for the purposes of the institution. If certain valuable chemicals are produced in a school by practical instruction in chemistry, and are subsequently sold instead of being wasted, that does not change the character of the use of the apparatus and of the original ingredients employed. And if a farm is set apart and cultivated to supply food for a family or community, it does not cease to be used for that purpose because, in the economical management of it, there are certain products which cannot be utilized otherwise than by sale.

The same considerations apply to the last question under the statute, whether any portion of the property was " used or appropriated for other than literary, educational, benevolent, charitable, or religious purposes." So long as the personal property was held by the plaintiff, it was not used otherwise than incidentally to the use of the farm, and so was not liable to taxation. The subsequent sale of it had no retroactive effect to subject it to assessment. Unless restrained by special provisions of law, any institution may sell its property which is exempt from taxation, and properly dispose of the proceeds.

The sale of farm products is ordinarily evidence that a farm is used for profit, and in most cases it would deprive a party of the exemption here claimed; but under the peculiar facts of this case we deem it unimportant, and hold that the ruling that the action could not be maintained was erroneous.

*Exceptions sustained.*