## UNITED STATES *v.* OLYMPIC CLUB (No. 1286).[1]

STATUE IMPORTED FOR A CLUB.

> The principal purpose of the Olympic Club is to encourage athletics, and to do this a regular corps of teachers is employed to give systematic physical instruction. Such an institution is engaged in educational work and a statue artistic in character imported for exhibition in the club falls within the terms of paragraph 715, tariff act of 1909, and was entitled to free entry.

### United States Court of Customs Appeals, May 4, 1914.

APPEAL from Board of United States General Appraisers, Abstract 33652 (T. D. 33763).

[Affirmed.]

*William L. Wemple*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.
*Carl A. Hansmann* for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court.

A marble sculpture of the Greek boxer Kreugas, copied by the sculptors Moretti and Rinaldi from the famous statue executed by Canova in the year 1790, was classified by the collector of customs at

---

[1] Reported in T. D. 34442 (26 Treas. Dec., 770).

the port of San Francisco as a "sculpture" and assessed for duty at 15 per cent ad valorem under that part of paragraph 470 of the act of 1909 which reads as follows:

470. * * * Sculptures, not specially provided for in this section, fifteen per centum ad valorem; but the term "sculptures" as used in this act shall be understood to include only such as are cut, carved, or otherwise wrought by hand from a solid block or mass of marble, stone, or alabaster, or from metal, and as are the professional production of a sculptor only, * * *.

The importer protested that the statue was a work of art entitled to free entry either under paragraph 715 or under paragraph 716 of the free list, which paragraphs, in so far as pertinent, are as follows:

Free list:

That on and after the day following the passage of this act, * * *, the articles mentioned in the following paragraphs shall, when imported into the United States, * * *, be exempt from duty:

    *        *        *        *        *

715. Works of art, * * * antiquities and artistic copies thereof in metal or other material, imported in good faith for exhibition at a fixed place by any State or by any society or institution established for the encouragement of the arts, science, or education, or for a municipal corporation, and all like articles imported in good faith by any society or association, or for a municipal corporation for the purpose of erecting a public monument, and not intended for sale, nor for any other purpose than herein expressed; * * *: Provided, That the privileges of this and the preceding section shall not be allowed to associations or corporations engaged in or connected with business of a private or commercial character.

716. Works of art, productions of American artists residing temporarily abroad, or other works of art, * * * imported expressly for presentation to a national institution, or to any State or municipal corporation or incorporated religious society, college, or other public institution, * * * except any article, in whole or in part, molded, cast, or mechanically wrought from metal within twenty years prior to importation; but such exemption shall be subject to such regulations as the Secretary of the Treasury may prescribe.

At the hearing, however, the claim that paragraph 716 was applicable to the importation was abandoned and accordingly whether the statue was within the meaning and intention of paragraph 715 became the only issue in the case.

The Board of General Appraisers found that the subject matter of the controversy was a work of art, the replica of an ancient piece of statuary wrought by Canova, and that it was entitled to free entry inasmuch as it had been imported by a society or association for no purposes other than those expressed in paragraph 715. The protests were therefore sustained by the board and from that decision the Government appealed.

In support of the appeal it is contended that the importation is not within any of the requirements for free entry prescribed by the statute, first, because the importer is not a society or institution established for the encouragement of art, science, or education; second, because the statue was not imported for exhibition at a

fixed place; and, third, because the importer is not a society or association organized for the purpose of erecting a monument.

The importer is the Olympic Club, of San Francisco, which, as appears from the evidence, is an incorporated society without capital stock organized not for profit or business but solely to encourage amateur athletics, to promote physical culture, and to advance social intercourse among its members. The membership is divided into nine classes, known as active, charter, life, honorary, nonresident, army and navy, athletic, junior, and juvenile members. Active members are such as are elected to that class by a committee on admissions and are required to pay an admission fee of $100 and $5 per month as dues. Charter members owe their membership to the fact that they were identified with the original organization of the club and are required to pay no dues. Life members are elected in the same manner as active members and are required to pay an admission fee of $500 but no dues. Honorary members become such on account of some striking service to the club or public and by unanimous consent of the directors; they are not obliged to pay either an admission fee or dues. The junior membership is made up of such sons, wards, and brothers of members as are over 16 and under 21 years of age, and the juvenile membership of such sons, wards, and brothers of members as are under 16 years of age. Athletic members are of two kinds—those elected by the board of directors on recommendation of the athletic committee, and those who are either athletic coaches and managers of certain universities or students distinguished in athletics and who are in attendance on such universities or on high schools bordering on the Bay of San Francisco. The dues of junior members are $2 per month, the dues of juvenile members $1.50 per month, and the dues of student members such as may be fixed by the board of directors. The right to hold office and the right to a voice and vote in the affairs of the club is vested in the active, charter, and life members, and upon them alone is imposed all liability for club indebtedness and assessments. The privileges of the club to be enjoyed by junior, juvenile, and student athletic members are prescribed by the directors, but all other members are entitled to such privileges as of right.

Athletics and physical culture are, as appears from the by-laws, the distinguishing features of the club, and the purposes to the advancement of which its energies are principally directed. In furtherance of the two objects which give the institution its distinctive character, it provides a gymnasium, a swimming tank, and the usual gymnastic appliances for the promotion of athletics and the development of the physical man. Had it stopped there the importer might well be regarded as differing in no essential particular from those social organizations which furnish facilities for physical im-

provement, the use of which is left to individual initiative without direction or systematized instruction. From the evidence in this case, however, it would seem that the Olympic Club goes further than that and that its activities have a very much wider range than those which characterize the ordinary social or athletic club. It furnishes a corps of teachers and professors for the instruction of its membership in physical culture, and that those excluded by their youth from the privileges of full membership may take advantage of such instruction, it opens its doors not only to members' sons, wards, and brothers who are under the age limit, but also to all students of the universities and high schools adjacent to San Francisco who have distinguished themselves in athletics. Junior and juvenile members are organized into classes for instruction in athletics and physical culture and to them at least knowledge of those subjects is imparted in a systematic way and by a teaching force apparently skilled in the work.

The purposes for which the club was chiefly organized and the methods adopted for their successful accomplishment clearly establish a design to promote, advance, and encourage athletics and physical culture, and that brings us to the consideration of the question of whether work of that kind may be properly regarded as educational. We think it can. Education means the training and development of the moral, intellectual, and physical faculties of man by means adapted to secure the intended result and intelligently applied. Complete training and development of the psychical and physical nature of the individual would of course be perfect education, but so far as we can find no such task has ever been seriously undertaken by any single educational institution. Whether the corporeal or the incorporeal part of the human make-up should receive attention, and whether both receiving consideration more emphasis should be placed on the development of the one than the other, has always depended on the subsisting condition of society and the prevalent relation of the individual to his fellows and the State. Originally food, shelter, clothing, and the common defense depended largely, if not exclusively, on physical skill, and training of the eye and the hand was as much education for primitive peoples as is the training of the mind for us. Even when civilization had progressed very considerably and the systematic cultivation of mind and morals found a larger place in the scheme of human existence, physical culture continued to be regarded as of first importance, and not until modern times, comparatively speaking, did the cultivation of the intellect become a predominant factor in educational work. The schools, colleges, or universities of these days devote themselves, it is true, largely to the arts and sciences, which call for intellectual training, and few, if any, are the educational institutions which make physical culture a feature of the curriculum. Nevertheless, from that it can

not be safely argued that a course of instruction which has for its aim physical perfection has ceased to be educational. As was well said by Mr. Justice Paynter, in German Gymnastic Association *v.* Louisville (80 S. W., 201):

Education is not confined to the improvement and cultivation of the mind. It may consist in the cultivation of one's religious or moral sentiments. It likewise may consist in the development of one's physical faculties.

The housing of a sound mind in a sound body makes as much now as it ever did for intellectual efficiency, and the institution which devotes itself solely to physical culture is just as much entitled to be ranked as educational as one which has no other purpose than the teaching of music, or painting, or sculpture. Mount Hermon Boys' School *v.* Gill (145 Mass., 139, 146); Ruchs *v.* Backer (6 Heisk., 395–400); Matter of Moses (138 N. Y. App. Div., 525, 528–529).

The Olympic Club has as its principal purpose the encouragement of athletics and physical culture. To carry this purpose into effect it organizes classes in athletics and provides a regular corps of professors and teachers upon whom is imposed the duty of giving systematic instruction in physical culture. It makes its appeal to the young, those who are still in the receptive stage. It not only cultivates friendly relations with the schools and universities in its vicinity, but in a measure it identifies itself with them by making students thereof distinguished in athletics partakers of its advantages and of the opportunities for physical betterment which it affords. Such an institution is, in our opinion, engaged in educational work, and therefore may be regarded as giving encouragement to education. German Gymnastic Association *v.* Louisville, *supra;* Matter of Mergentime (129 N. Y. App. Div., 367, 371–373).

The contention of the Government that the statue was not imported "for exhibition at a fixed place" as required by paragraph 715 is predicated on the assumption that the term "exhibition" necessarily implies a *public* display, and on the further assumption that the statue was not brought into the country by a public institution, but by a private social club to which it does not appear that the public is ever admitted. The privilege of importing works of art free is not confined by the statute to *public* institutions, and if it were it might be argued with some force that the Olympic Club is entitled to the designation, inasmuch as it systematically occupies itself with work designed to promote to some extent the public welfare. But however that may be, we do not think that the provision of paragraph 715, which prescribes "importation for exhibition" as a condition for free entry, necessarily requires that works of art shall be exposed to view in a public place or that they shall be open to the inspection of the people at large at all times without rule or regulation. Such an interpretation would exclude from the benefit of the provision art schools and museums which reserve to themselves the

right to say when, how, and to what extent the art treasures collected by them shall be viewed by people not identified with such institutions, and would limit the provision to societies and associations importing works of art for exhibition in parks, squares, public buildings, and other similar public places. We think that Congress intended no such result as that to follow and that if works of art imported by any society or institution established for the encouragement of art, science, or education are designed to be displayed in a fixed place where those who wish may see them upon compliance with reasonable rules and regulations they are imported for exhibition, even if that term implies a *public* display, as contended by the Government.

Under the by-laws of the Olympic Club any person not a member may secure the privileges of the club house for a whole day twice a year by having his name registered by a member in the "visitors' book." Such a regulation, it seems to us, affords to all who ought to see the statue in question ample opportunity to do so and is no more burdensome than would be the securing of a permit to visit an art school or museum. Whether the Olympic Club is a society or an association for the erection of a public monument we deem it unnecessary to consider, holding, as we do, that the club is an institution for the encouragement of education and that the statue under consideration was imported for exhibition at a fixed place.

The decision of the Board of General Appraisers is *affirmed.*