NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12675

THE McLEAN HOSPITAL CORPORATION  vs.  TOWN OF LINCOLN & others.[1]


Suffolk.     April 2, 2019. - September 23, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
          & Kafker, JJ.


Zoning, Educational use.  Education, Zoning.  Words,
    "Educational purpose."


Civil action commenced in the Land Court Department on
November 15, 2016.

The case was heard by Karyn F. Scheier, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Diane C. Tillotson (M. Patrick Moore, Jr., also present)
for the plaintiff.
Jason R. Talerman for town of Lincoln & others.
Michael C. Fee, for Arthur Anthony & others, was present
but did not argue.

---

[1] Building commissioner of Lincoln, zoning board of appeals
of Lincoln, Arthur Anthony, Lara Anthony, Edwin David, Nandini
David, Douglas Elder, Lisa Elder, Jay Gregory, Lisa Gurrie,
Michael Gurrie, Beverly Peirce, and Daniel Peirce; and Linda
Kanner, Steven Kanner, Robyn Laukien, Daniel McCarthy, and
Donald McCarthy, interveners.

Benjamin Fierro, III, for Association for Behavioral Healthcare, Inc., & others, amici curiae, submitted a brief.
Felicia H. Ellsworth & Julia Prochazka, for Disability Law Center & another, amici curiae, submitted a brief.

LENK, J.  The question before us is whether the plaintiff's proposed residential program for adolescent males falls within the meaning of the Dover Amendment, G. L. c. 40A, § 3, second par.  If so, it is exempt from certain zoning restrictions because the land and buildings would be used for "educational purposes."  The plaintiff, The McLean Hospital Corporation (McLean), purchased 5.5 acres of land in the town of Lincoln (town), intending to develop a residential life skills program for fifteen to twenty-one year old males who exhibit extreme "emotional dysregulation."  The program would allow these adolescents to develop the emotional and social skills necessary to return to their communities to lead useful, productive lives.

Before purchasing the property, McLean, a nonprofit institution, wrote to the town's building commissioner explaining the proposed use, and seeking a determination whether the project could proceed as of right, pursuant to the Dover Amendment, see G. L. c. 40A, § 3, second par., and its local analog, section 6.1(i) of the town's bylaw.  The building commissioner replied in writing that the proposed use was educational, and that McLean could proceed under the Dover Amendment and the bylaw.  After the purchase, however, a number

of nearby residents challenged the decision before the town's zoning board of appeals (board). The board decided that the program was medical or therapeutic, as opposed to educational, and reversed the building commissioner's determination. McLean initiated an action in the Land Court challenging the board's decision. After a four-day trial, a Land Court judge determined that the proposed use was not primarily "for educational purposes," under a novel theory that attempted to distinguish between life skills that are "focused outward" and those that "look inward." McLean appealed, and we allowed McLean's petition for direct appellate review.

We conclude that, although not a conventional educational curriculum offered to high school or college students, the proposed facility and its skills-based curriculum fall well within the "broad and comprehensive" meaning of "educational purposes" under the Dover Amendment. See Regis College v. Weston, 462 Mass. 280, 286, 291 (2012). Accordingly, the decision of the Land Court judge must be vacated, and the matter remanded for entry of a judgment in favor of McLean.[2]

---

[2] We acknowledge the amicus briefs submitted by the Disability Law Center and the Mental Health Legal Advisors Committee; and by the Association for Behavioral Healthcare, Inc., the Association of Developmental Disabilities Providers, Inc., the Massachusetts Association of 766 Approved Private Schools, Inc., and the Massachusetts Council of Human Service Providers, Inc.

1.  <u>Background</u>.  We recite the essentially undisputed facts found by the trial judge, supplemented occasionally with uncontroverted facts in the record.  See <u>Vaiarella</u> v. <u>Hanover Ins. Co</u>., 409 Mass. 523, 524 (1991).

a.  <u>Other programs</u>.  The plaintiff currently operates a smaller version of the planned program, known as the "3East program," at its campus in Belmont, as well as a similar program for girls.  McLean also operates a program for adults with emotional disorders, who are transitioning back into the community from a hospital setting, at another location in the town; that facility is a protected educational facility under the Dover Amendment, G. L. c. 40A, § 3, second par.  McLean wants to move the 3East program from its already cramped quarters in Belmont to the newly purchased land in Lincoln so that it can increase the number of adolescents that the program serves, from six to twelve at any given time.

b.  <u>3East program</u>.  The 3East program's curriculum is designed to instill fundamental life, social, and emotional skills in adolescent males who are deficient in these skills, who experience severe emotional dysregulation, and who have been unable to succeed in a traditional academic setting.  Many of the residents have been diagnosed with borderline personality disorder; all have varying degrees of emotional dysregulation.  Some have a co-occurring condition such as attention deficit

disorder, anxiety, or depression, and some have no official diagnosis.

Regardless of their diagnosis, all of the residents at McLean share difficulties in identifying and regulating their emotions, and therefore may react to ordinary, day-to-day events, which they perceive as stressful situations, with outbursts of fear, anger, or self-loathing.  Overwhelmed by emotions they cannot identify or control, these individuals have difficulty concentrating in school, following directions, responding appropriately to others, and maintaining interpersonal relationships.  They tend to view situations as juxtapositions of diametrically opposite positions (from "opposite sides of the Grand Canyon"), with no middle ground. Slight disappointments (i.e., "can we meet at 5:15 rather than 5:00?") may be viewed as negative statements about themselves, and can lead to increased feelings of abandonment, shame, "emptiness," anger, and resentment.

The 3East program uses a highly structured, nationally recognized, dialectical behavior therapy (DBT) approach to attempt to develop social and emotional skills in students with severe deficits in these skills.  To do so, the program teaches students to notice and identify their emotions, to slow down and consider alternatives rather than simply reacting, and to interact constructively with other people.  It teaches

fundamental behavioral skills so that the students, whose difficulties in emotional regulation interfere with an ability to learn in a more traditional setting, may acquire skills to respond more productively to the challenges that confront them in their day-to-day lives. The goal of the program is to enable the students to return to their communities and their families, to succeed in traditional educational programs, and to become able to lead productive lives.

Entrance to the 3East program is selective. The admissions process screens out any individual who is unstable or requires hospitalization. Prospective residents also must demonstrate that they are ready and willing to devote themselves to learning these behavioral and cognitive skills, with the expectation that they will be able to function in their respective communities in the future. Once selected, participation in the immersive residential program generally lasts for sixty to 120 days; residents who complete the program successfully receive a graduation certificate.

During their time at the 3East program, residents receive approximately eleven hours per day of instruction and practice in social and emotional skills, focused in five well-established areas where prior research has shown that training can be very effective: mindfulness and ability to pay attention; emotional

regulation; development and maintenance of interpersonal relationships; distress tolerance; and validation.

According to Alan Fruzzetti, the director of the program and the only individual explicitly credited by the judge, mindfulness "in DBT is defined as being able to pay attention on purpose in the present moment and without being judgmental."  It is considered the "core skill in DBT," and involves emotional control and focus, which, the director pointed out, are essential "for learning anything."  Emotional regulation teaches individuals how to identify the specific emotion "they are feeling, so as to enjoy positive emotions and 'reduce their reactivity to a whole host of different stimuli in the world.'"  Distress tolerance is "a set of skills" that helps people "get[] through an apparent crisis" without making it "worse."  Validation skills allow individuals to recognize and accept their own feelings and those of others without "judgments [that] tend to fuel negative emotion" toward oneself and others.

A typical day at the 3East program begins at 8:30 A.M., with group mindfulness exercises, followed by classroom instruction from 9 A.M until 4 P.M.[3]  After classroom work is over, there are one and one-half hours for structured athletic time or family therapy, followed by dinner and a final group

---

[3] The students have a forty-five minute break for lunch, and fifteen minutes of group mindfulness exercises.

mindfulness exercise.  After a forty-five minute period of skills practice and homework worksheets, the students have a period of free time until lights out at 10 P.M.

The curriculum is taught in an experiential manner by specialists in clinical education.  Each day, the students learn multiple skills in forty-five minute classroom sessions, as well as how to apply them to the complex problems in life that they may encounter at home, school, or work.  The process involves formal training sessions, demonstrations and examples by the instructors, group practice, and individualized practice sessions for each student, as well as daily worksheets and homework.  Although a part-time registered nurse is available to treat any medical issues that arise for staff or students, no medical interventions are included as part of the program.

2.  Discussion.  The parties generally accept the judge's findings of fact; they dispute only her determination that the primary purpose of the proposed facility cannot be characterized as "educational" under G. L. c. 40A, § 3, second par.  "The central issue in this case," then, "is one of law, not of fact."[4]

---

[4] In Fitchburg Hous. Auth. v. Board of Zoning Appeals of Fitchburg, 380 Mass. 869, 873 (1980), the court concluded:  "If the judge's characterization of the proposed facility as a 'medical facility' is a conclusion that, as a matter of law, the proposed use would not be 'educational,' it must be reversed as an error of law."  See id., citing New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 674 (1977).  "To the extent that it is a finding of fact, it must be set aside as 'clearly

See Fitchburg Hous. Auth. v. Board of Zoning Appeals of Fitchburg, 380 Mass. 869, 872 (1980).  We must ascertain, based upon the facts found by the trial judge, to which we afford appropriate deference absent clear error, whether McLean's proposed use of the property qualifies as having "educational purposes" within the meaning of the Dover Amendment.  See id. at 872-873.  See also Kurz v. Board of Appeals of N. Reading, 341 Mass. 110, 112 (1960) (meaning of "educational use" in local bylaw "is a question of law for the court").

a.  Dover Amendment.  The Dover Amendment exempts from local zoning laws those uses of land and structures that are for "educational purposes."  See G. L. c. 40A, § 3, second par.  The Dover Amendment provides, in relevant part,

> "No zoning ordinance or by-law shall . . . prohibit, regulate or restrict the use of land or structures for religious purposes or for educational purposes on land owned or leased by the commonwealth or any of its agencies, subdivisions or bodies politic or by a religious sect or denomination, or by a nonprofit educational corporation; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements" (emphasis added).

In Regis College, 462 Mass. at 285-291, we articulated a two-pronged test to determine whether a proposed use falls

---

erroneous.'"  Fitchburg Hous. Auth., supra, quoting Mass. Civ. P. 52 (a), 365 Mass. 816 (1974).

within the protections of the Dover Amendment.  First, the use must have as its "bona fide goal something that can reasonably be described as 'educationally significant.'"  Id. at 285, quoting Whitinsville Retirement Soc'y, Inc. v. Northbridge, 394 Mass. 757, 761 n.3 (1985).  Second, the educationally significant goal must be the "'primary or dominant' purpose for which the land or structures will be used."  Regis College, supra, quoting Whitinsville Retirement Soc'y, Inc., supra at 760.  The primary or dominant purpose requirement "helps ensure that a party invoking Dover Amendment protection does so without engrafting an educational component onto a project in order to obtain favorable treatment under the statute."  Regis College, supra at 290.

b.  Whether the proposed 3East program has an educationally significant goal.  The word "educational," as used in the Dover Amendment, has been construed on numerous occasions, for more than 120 years, as a "broad and comprehensive" term.  See Regis College, 462 Mass. at 285, quoting Mount Hermon Boys' Sch. v. Gill, 145 Mass. 139, 146 (1887).  Over time, we have made clear that the protections of the Dover Amendment are not to be "limited only to those facilities closely analogous to traditional schools and colleges."  See Regis College, supra at 286.  Rather, the term "educational" encompasses that which is "the process of developing and training the powers and

capabilities of human beings." Mount Hermon Boys' Sch., supra. Thus, the Dover Amendment embraces fully "the idea that education is the process of preparing persons for activity and usefulness in life" (quotation and citation omitted). See Fitchburg Hous. Auth., 380 Mass. at 875.

Based on our long-standing jurisprudence, it appears relatively undisputed that the 3East program includes an educationally significant component. Indeed, we repeatedly have held that a program that instills "a basic understanding of how to cope with everyday problems and to maintain oneself in society is incontestably an educational process" within the meaning of the Dover Amendment (emphasis added). See Fitchburg Hous. Auth., 380 Mass. at 875. See also Gardner-Athol Area Mental Health Ass'n, Inc. v. Zoning Bd. of Appeals of Gardner, 401 Mass. 12, 14 (1987) (proposed use educational where program taught "daily living, as well as vocational skills, with the goal of preparing [its residents] for more independent living").

That the 3East program encompasses an educationally significant component, however, is not sufficient for the program to fall within the ambit of the Dover Amendment. To do so, the educationally significant goal of the program also must be the predominant purpose for which the land and structures will be used. See Regis College, 462 Mass. at 285.

c.    Whether the primary or dominant purpose is educational.
The defendants contend that any educational components of the
3East program merely are ancillary to the predominant purpose
for which the facility would be established, that is, to provide
medical treatment for a particular psychological condition.
McLean responds that the educationally significant goal of the
3East program is also its dominant or primary purpose, and that
the Land Court judge erred in determining that the purpose is
predominantly "therapeutic."

This court has not held, as the defendants ask us to do,
that a skills development program loses its primary educational
purpose when the particular competencies taught also may be
therapeutic, rehabilitative, or remedial of an underlying
condition.  To the contrary, courts in the Commonwealth have
concluded that "'education' and 'rehabilitation' do not denote
functions so distinct that [a local zoning authority or a court]
could be required to quantify them relative to each other."
Harbor Sch., Inc. v. Board of Appeals of Haverhill, 5 Mass. App.
Ct. 600, 604 (1977).  See Gardner-Athol Area Mental Health
Ass'n, Inc., 401 Mass. at 15 ("Rehabilitation surely falls
within the meaning of education").  Indeed, those concepts "are
not mutually exclusive."  See Harbor Sch., Inc., supra.  Rather,
education encompasses that which is "particularly directed to
either the mental, moral, or physical powers and faculties, but

in its broadest and best sense it relates to them all." Whitinsville Retirement Soc'y, Inc., 394 Mass. at 759.

A determination whether the land and structures at issue here would be used for a predominantly educational purpose also does not, and should not, turn on an assessment of the population it serves. Although "emotional or psychiatric programs may determine the character of the training furnished to residents of the proposed facility," they certainly "do not mark the facility as 'medical' or render it any less educational." See Fitchburg Hous. Auth., 380 Mass. at 873, 875 ("The fact that many of the residents of the facility . . . will be taking prescription drugs does not negate its educational purpose or make its dominant purpose medical"). Such programming, rather, exists to "serve[] nontraditional communities of learners in a manner tailored to their individual needs and capabilities." See Regis College, 462 Mass. at 285-286 (Dover Amendment applies to "facilities for the disabled or the infirm"); Watros v. Greater Lynn Mental Health & Retardation Ass'n, Inc., 421 Mass. 106, 108, 115-116 (1995) (Dover Amendment applies to residential education facility for adults with mental disability).

Thus, although the 3East program's facility and its curriculum will be tailored to serve participants who previously may have been inpatients at a psychiatric facility, that fact

alone does not serve to brand the 3East program as a medical program.  Nor does having been a patient at a psychiatric facility in the past preclude an individual from participating in a specialized form of education to learn the complex emotional, social, and daily living skills necessary to participate actively and succeed in life.

Indeed, the emotional and behavioral skills that would be taught at the 3East program increasingly are becoming a component of the educational curriculum in many traditional public school settings across the Commonwealth.  See, e.g., G. L. c. 69, § 1P (enacting framework for schools to help students "regulate their emotions and behavior" and to integrate "social and emotional learning," "children's mental health," and "positive behavioral approaches"); Department of Elementary and Secondary Education, Strategic Plan, at 1, 9 (rev. Feb. 2019) (core strategy of public schools is "supporting the social, emotional, and health needs" of students).  See also J.J. Mazza, E.T. Dexter-Mazza, A.L. Miller, J.H. Rathus, & H.E. Murphy, DBT Skills in Schools:  Skills Training for Emotional Problem Solving for Adolescents, at 3-4, 26-33 (2016) (noting use of DBT curriculum in both traditional and nontraditional academic settings).

The defendants contend that the 3East program is distinguishable from the facility in Fitchburg Hous. Auth.,

because the 3East program has a psychiatrist on staff, and the participants may be a threat to themselves or others, in light of some of their histories of thoughts of suicide or self-injurious behaviors. Cf. Fitchburg Hous. Auth., 380 Mass. at 873, 875. Should we conclude that the 3East program has a predominantly educational purpose, the defendants caution against a slippery slope in which every therapist's or doctor's office or hospital could become a facility afforded protection under the Dover Amendment. This, of course, is not the case.

While the presence or absence of medical personnel on staff may be one factor in the calculus, it certainly does not alone create the bright-line rule that the defendants suggest and, without more, render a program medical and not educational. As McLean points out, ordinary public schools often have registered nurses or other medical personnel on staff. Nor does the involvement of an individual therapist assigned to each adolescent, for twice-weekly sessions throughout the course of the program, transform the program into a medical treatment plan. The students engage in what might equate to an individualized therapy appointment for two hours of the roughly seventy-hour week of structured skills training and group and individual practice.

Moreover, the structure of the 3East program is distinct from a medical appointment or an inpatient placement at a

psychiatric hospital. As stated, the full-time program includes an admissions process, instruction on social and emotional skills development, group and individual sessions, exercises to practice the skills learned, structured social and athletic time with classmates and peers, and homework and worksheets to complete each evening. Compare Harbor Schools, Inc., 5 Mass. App. Ct. at 600, 605 (residential facility for children with emotional regulation issues was educational and not medical).

The teachers and therapists who form the staff at the 3East program are not doctors. They are required to have a Bachelor's degree, not unlike the teachers in schools across the Commonwealth. They also have specialized training in areas such as education theory, coaching, and DBT. Notably, the trial judge explicitly found that no medical interventions are used in the 3East program.

The defendants' argument that the 3East program exemplifies our previously expressed concern that a purely residential facility may not add an informal educational component merely as a smokescreen in order to obtain favorable protections under the Dover Amendment also is unavailing. See Regis College, 462 Mass. at 287 (optional coursework cannot be mere "window dressing" for luxury condominium complex); Whitinsville Retirement Soc'y, Inc., 394 Mass. at 760 (informal arts and crafts program did not render nursing home educational). The

3East program includes a full-time, highly structured, mandatory curriculum taught by formally and specially trained staff, upon graduation from which the students ideally will return to their respective high schools, colleges, and communities.

Finally, in an effort to distinguish the 3East program from the programs at issue in Gardner-Athol Area Mental Health Ass'n, Inc., 401 Mass. at 14, and Fitchburg Hous. Auth., 380 Mass. at 871-872, the defendants and the Land Court judge rely on a purported dichotomy between "outward"-facing skills (i.e., those that help assimilate individuals into their respective communities) and "inward"-facing skills (i.e., those that help address any internal manifestations or symptoms of a mental disorder).  We have not previously endorsed such a distinction, nor do the parties identify any case law or scientific research that would support such a concept.  As the plaintiff indicates, inward-facing skills, which presumably would encompass the mindfulness, emotional regulation, distress tolerance, and validation components of the program, also have an enormous impact on an individual's ability to engage in work or study, and to interact outwardly with others.  See Fitchburg Hous. Auth., supra at 875 (baseline skills to "cope with everyday problems and to maintain oneself in society" deemed educational).  Moreover, the "development and maintenance of interpersonal relationships," one of the five core program

components, is explicitly limited to outward-facing skills. The gym activities and group mindfulness activities also incorporate mandatory group and interpersonal components.

Both inward-facing and outward-facing types of skills, even assuming they can be meaningfully parsed in this manner, are part of "the idea that education is the process of preparing persons 'for activity and usefulness in life'" (citation omitted), Fitchburg Hous. Auth., 380 Mass. at 875, and thus protected as a significant educational purpose under the Dover Amendment. While we have made clear that "a basic understanding of how to cope with everyday problems and to maintain oneself in society is incontestably an educational process" within the ambit of the Dover Amendment, id., it also would be impossible to exclude the acquisition of these skills from serving a "therapeutic" purpose.

We accordingly agree with McLean that, in situations of this type, an attempt to sever that which is educational from that which is therapeutic is ordinarily a rather futile exercise. Focusing on the "therapeutic" aspects of a program such as the one at issue shifts the analysis from the program's educational purposes, and whether education is a significant part of the program, to the type of student who is participating in the program, which is precisely what, as we have said, should not be the foundation of an analysis under the Dover Amendment.

We decline once again to adopt as dispositive a distinction between education with a therapeutic purpose -- to teach how to live in society, cope with daily tasks, and interact with others -- and education with a traditional academic purpose. See Regis College, 462 Mass. at 285-286, 291. We also decline to adopt the judge's parsing of distinctions between a "therapeutic" program to teach inward-facing life skills and an "educational" program to teach outward-facing life skills. See Mount Hermon Boys' Sch., 145 Mass. at 146 ("educational" purpose encompasses "the process of developing and training the powers and capabilities of human beings").

In sum, that the curriculum of the 3East program may encompass elements of teaching emotional regulation, and allows two percent of the weekly program hours to be devoted to individual therapy, or that some of the skills are taught by clinical professionals, does not negate the fact that the predominant purpose of the 3East program is educational. Cf. Watros, 421 Mass. at 108, 115-116 (residential facility for adults with mental disability was educational within meaning of Dover Amendment notwithstanding therapeutic aspect). To the contrary, these features indicate that the 3East program is a specialized form of education, with therapeutic aspects, that ultimately teaches its participants the skills necessary for

their success, "activity and usefulness in life" (citation omitted).[5]  See <u>Mount Hermon Boys' Sch</u>., 145 Mass. at 146.

3.  <u>Conclusion</u>.  The judgment is vacated and set aside, and the case is remanded to the Land Court for entry of judgment in favor of McLean.

<u>So ordered</u>.

---

[5] Our conclusion in this regard comports with the legislative history of the Dover Amendment, which we have had considerable occasion to examine in the context of educational programs.  See, e.g., <u>Regis College</u> v. <u>Weston</u>, 462 Mass. 280, 286 (2012); <u>Trustees of Tufts College</u> v. <u>Medford</u>, 415 Mass. 753, 757-758 (1993).  In so doing, we have noted that, although the Department of Community Affairs had proposed "that Dover Amendment protection be limited to 'school[s]' or analogous 'place[s] or facilit[ies],'" see 1972 House Doc. No. 5009, at 84, the Legislature rejected this language.  See <u>Regis College</u>, <u>supra</u>.  It thus opted not to adopt "a statutory test that would limit Dover Amendment protection only to projects similar to 'schools.'"  See <u>id</u>.  The Dover Amendment also exists, in part, to protect educational institutions from a municipality's exercise of preferences as to what kind of educational facilities it will welcome, "the very kind of restrictive attitude which the Dover Amendment was intended to foreclose." See <u>The Bible Speaks</u> v. <u>Board of Appeals of Lenox</u>, 8 Mass. App. Ct. 19, 33 (1979).  The use of land for nontraditional educational accordingly was anticipated by the drafters of the Dover Amendment.