NEW ENGLAND SANITARIUM *vs.* INHABITANTS OF STONEHAM.

Middlesex.   November 18, 1909. — February 28, 1910.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Tax,* Exemption.   *Charity.*

The charter of a corporation stated that it was organized " for the purpose of founding a hospital or charitable asylum . . . for the care and relief of indigent or other sick or infirm persons, at which institution may be received also patients and patrons who are able to and who pay for the benefits therein received and which institution shall devote the funds and property acquired . . . exclusively to maintain itself, improving its conditions and facilities, extending its benefits and usefulness and facilitating and promoting its purposes by such sanitary, dietetic, hygienic and philanthropic reforms and efforts as are germane or auxiliary thereto. · All of its said purposes being undenominational, non-sectarian, philanthropic, humanitarian, charitable and benevolent and in no manner directly or indirectly for profit or dividend paying to any one." The corporation, from contributions, supplemented by loans and mortgages from friends, purchased land, built thereon several buildings and conducted a modern sanitarium with physicians, nurses and attendants. Besides the sources above mentioned, the expense of maintenance was paid by sums paid by various patients and others who came to visit patients. During the year 1907, one and seven one hundredths per cent of those who received accommodations were free patients, four and seven one thousandths per cent were part paying patients, and the rest paid the full rate named in an advertised schedule which ranged from $12 to $35 per week. None of the officers of the corporation, except the treasurer, who also was the manager, received any remuneration. Free patients, before they were admitted, had to be passed upon by a committee as to their character and financial standing. *Held,* that the personal property and real estate of the corporation was exempt from taxation under the provisions of R. L. c. 12, § 5, cl. 3, which exempts from taxation the personal property of benevolent and charitable institutions and such of its real estate as is owned and occupied by it for the purposes for which it was incorporated.

PETITION to the Superior Court, filed on March 24, 1908, under R. L. c. 12, § 78, on appeal from a decision of the assessors of the town of Stoneham refusing to abate a tax assessed upon the real estate and personal property of the petitioner for the year 1907, the petitioner contending that it was a charitable or benevolent institution and therefore that it was within the provisions of R. L. c. 12, § 5, cl. 3, and entitled to an exemption from taxation. The petitioner had paid the tax under protest.

The petition was referred to Marcus Morton, Esquire, as commissioner under R. L. c. 12, § 80. The report of the commissioner, besides the findings of facts and rulings of law stated in the opinion, contains the following findings of fact:

" The petitioner's real estate in Stoneham, valued at $100,000, consisted of about forty-two acres of land upon which there have been erected a large main building, a large annex, three cottages or dormitories, a barn for livery and boarding accommodations and several other buildings. The main building, which was especially constructed for a sanitarium, has sixty-five rooms for patients and physicians and for treatment of patients, is supplied with an elevator, is heated by steam, contains electric lights, call bells, telephones and baths. There are twelve corner rooms provided with private baths and toilet and private telephones. The annex, so called, is used for nurses' rooms, nurses' class rooms, chapel, gymnasium, a large parlor and a number of rooms fitted up for patients' rooms. In the basement of this building are the treatment rooms, in which are various kinds of baths for massage and electrical treatment. One of the cottages is used for the residence of the superintendent and nurses' rooms and the other cottages are used for patients and nurses' rooms. In all there are seventy-eight patients' rooms. There are no large ward rooms but there are four small rooms which accommodate three or four patients each. The patients had access to a gymnasium which was maintained upon the premises, there being also conducted gymnasium classes and free lectures held once or twice every week on medical and health topics by the physicians. The land upon which the buildings stand is used for lawns, gardens, vegetable gardens and pasture for cows, all of which purposes are in connection with the work of the sanitarium. The grounds

also have upon them golf links for the use of those who come to the sanitarium, which were constructed by one of the patients.

"In 1907, the staff in charge of the institution consisted of a superintendent, a male physician, lady physician and superintendent of a training school for nurses. There was also a head nurse both for ladies and gentlemen, between forty and fifty nurses, a steward, a business manager, several call boys, bookkeeper, stenographer, engineer, fireman, housekeeper, matron and half a dozen outside workers," most of whom received some remuneration. A nurses' school was conducted, the students "being trained to become missionary nurses for the purpose of combining the care of the sick with religious work for the poor, the course of training being three years."

"The petitioner furnished free of charge the services of both nurses and physicians to help care for the indigent sick among the Hebrews in Boston. They also paid the travelling expenses and furnished medicines without charge in connection with the services."

"The petitioner advertised in medical journals and issued for circulation a pamphlet descriptive of the institution and its methods. The pamphlet contained an attractive description in detail of the grounds and buildings and various conveniences and appliances adapted to the comfort and health of those in the institution. It described the work of the institution as a 'Physiological Method' which recognized that nature was the real physician and educated patients out of a morbid state into a condition of health, and taught them how to live in harmony with nature. It invited to the institution chronic invalids, as well as cases of recent or acute illness, excluding contagious, incurable, insane and epileptic cases. It also invited those who were tired out and required only rest and mental diversion, offering to receive them for the cost of board and room, without treatment, at reasonable rates when the accommodations would permit. The rates for room, board and treatment were stated. . . . The pamphlet stated that the lowest rates were less than actual cost and were offered to those of restricted financial circumstances and that further consideration would be shown to worthy persons who could not afford to pay anything for medical services by giving treatment of such cases as were properly recom-

mended without charge for medical attention and treatment, a small charge being made to cover the actual cost of board and special nurses.   As accommodations as stated for this class were necessarily limited to the surplus earnings of the institution which were not required for improvements and repairs, correspondence was demanded in advance with reference to them. Discounts from regular rates for treatment were offered to physicians, clergymen and missionaries, and members of their families depending upon them, on rooms of $15 and upwards, but no discount was offered on the price of board.   Worthy objects of charity, it was stated, would receive consideration but could only be received by previous arrangement.   The pamphlet also stated that the work of the institution was established as a philanthropic enterprise and that the funds for starting it were raised from friends and donated to the work, none of the contributors receiving any return therefrom, and that under its charter all earnings not needed for expenses, improvements and medical appliances, were to be devoted to benevolent work.

" The institution admitted and provided for three classes of occupants, — permanent, boarding and transient.   Permanent or patient class stayed some length of time, at least one half a week ; a transient spent the night or took a treatment or had a meal. Only about half of the transients received treatment.   Boarders were friends of patients who helped care for them and others who came for the benefit of the board.   They received no treatment. These three classes were again divided into those who paid in full, those who paid in part, and those who paid nothing."   Of those who received accommodations at the institution during the year 1907, 1.07% were free patients, 4.007% were part paying patients, and 65% were included under the designation " transient and board paying patients."

" The names of those who applied for free service or requested a deduction from the regular rate were referred to a committee which inquired into the worthiness of the case and the financial standing of the applicant.   It was the purpose of the institution to receive such applicants if and when the surplus earnings not required for improvements and repairs permitted.   It actually, however, took some of them at times when the surplus did not warrant such a cost.

" The institution received an initial endowment of $22,000 and has also raised by loans and mortgages, principally from friends, and at a low rate of interest, $54,803, all of which amounts have been expended upon the property. It has also received from friends of the institution towards running expenses, donations of $7,762 during the years from 1901 to 1908.

" Its principal revenue, however, has been derived from the fees charged for services amounting during the same years to $266,179. The rates charged depended upon the nature of the accommodations furnished and ran from $50 to $20 a week for suites with private baths to $14 and $12 a week for rooms in the wards including treatment; and for board and room without treatment from $16 to $8 a week for adults and from $7 and $3 a week for children.

" All the revenue was used for the work of the institution as stated. No profit or financial benefit accrued to any officer, member of the corporation or incorporator, except the treasurer who was also business manager. They gave their services free. Very many of those who are in the service of the institution and receive pay for their services accept less than the services are reasonably worth because of their interest in the work."

The petition was heard by *Hardy,* J. The only evidence was the commissioner's report and the pamphlet and list of figures therein referred to. The judge found in accordance with the conclusions of fact and rulings of law in the commissioner's report, which are stated in substance in the opinion, ruled that the petitioner was not entitled to an abatement and by agreement of the parties reported the case for determination by this court, judgment to be entered for the petitioner for the tax assessed and paid by it with interest, if the court should be of the opinion that it was entitled to an abatement; otherwise, judgment to be entered for the respondent for costs.

*J. A. Lowell,* (*L. Hill* with him,) for the respondent.

*O. Storer,* for the petitioner.

BRALEY, J. The exceptions to the denial of the motion to dismiss having been waived, the report of the presiding judge presents for decision the question, whether the real and personal property of the petitioner, upon which the respondent assessed and collected a tax, was exempt under the provisions of R. L. c. 12,

§ 5, cl. 3. The petitioner was incorporated, "for the purpose of founding a hospital or charitable asylum within the State of Massachusetts for the care and relief of indigent or other sick or infirm persons, at which institution may be received also patients and patrons who are able to and who pay for the benefits therein received and which institution shall devote the funds and property, acquired and received by it from time to time and from all sources, exclusively to maintain itself, improving its conditions and facilities, extending its benefits and usefulness and facilitating and promoting its purposes by such sanitary, dietetic, hygienic and philanthropic reforms and efforts as are germane or auxiliary thereto. All of said purposes being undenominational, non-sectarian, philanthropic, humanitarian, charitable and benevolent and in no manner directly or indirectly for profit or dividend paying to any one." The report states very fully the endowment and financial resources of the corporation, and the details of its management in the reception and care of the classes of patients who were admitted. It appears that the land and buildings with their furnishings and equipment as a hospital were paid for by contributions supplemented by loans and mortgages from friends; and the entire income from all sources is spent in furtherance of the purposes of the institution, while the members and officers, with the exception of the treasurer, give their services. In its advertisements in medical journals, and in the pamphlet descriptive of the institution and its methods, while the graduated cost of board and expenses of medical services and nurses were given, a statement of its charitable character, and that under its charter all earnings not needed for expenses, improvements and medical appliances were to be devoted to benevolent work, also appears. It invited at different prices those who needed rest with mental diversion and chronic invalids for treatment, while excluding persons suffering from contagious or incurable diseases or who were insane or epileptic. If those who applied for free treatment, or for a reduction from the regular rates were not admitted until a committee had passed upon the character and financial standing of the applicant, a regulation of this nature was not only reasonable, but necessary to prevent imposition. In his summary of the work accomplished during the six years of its domicil in the town, the commissioner

states that of the entire number of patients admitted by far
the larger part were paying patients, but it also appears that the
expenses in some years were so increased by caring for free
patients and those who could not pay in full, and by disburse-
ments for outside charitable work, that a deficit resulted.

The commissioner, while not explicitly separating his findings
of fact from his rulings of law, upon which the judge affirmed
and ordered judgment for the respondent, leaves no doubt as to
the grounds upon which he refused to rule as requested by the
petitioner, that it was a charitable corporation.   They appear
in these paragraphs which follow the findings of fact: " The
plaintiff was not run as a public hospital under obligation to
receive and care for at any time the indigent and sick.   While
it intended mainly to care for the sick it might fill up its rooms
with those who were not sick in the ordinary meaning of the
word and who could pay for benefit received.   It in fact re-
ceived a large number of this class.   It was run rather as a
health resort which, while its purposes were humanitarian, did
not necessarily or primarily help to relieve the community of its
burden of caring for the indigent and sick."

It may be conceded that a trust for the exclusive benefit of
the least wealthy of a well to do or prosperous class could not
be sustained as a charity under the St. of 43 Eliz. c. 4.   *Attorney
General* v. *Northumberland*, L. R. 7 Ch. D. 745.   But the con-
trolling purpose may be none the less charitable, even if those
who need no pecuniary aid are either directly or indirectly bene-
fited.   A hospital established for the free treatment of poor
patients may receive payments from rich persons who are per-
mitted to avail themselves of its benefits.   Every charity created
for the gratuitous treatment and relief of disease, or the physical
infirmities of the indigent, or other purposes enumerated in this
statute, or if not enumerated, which are held to come within its
spirit and intendment, in a large sense helps and aids the com-
munity, without regard to the social rank or pecuniary condi-
tion of its members.   Lord Camden in *Jones* v. *Williams*, Ambl.
651, tersely defined a charity to be, a " gift to a general use,
which extends to the poor as well as the rich," and this defini-
tion has been amplified, approved and followed in *Drury* v.
*Natick*, 10 Allen, 169, *Jackson* v. *Phillips*, 14 Allen, 539, and

*Dexter* v. *Harvard College*, 176 Mass. 192.   It is not confined to mere almsgiving or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man.   *Molly Varnum Chapter, D. A. R.* v. *Lowell*, 204 Mass. 487.   Gifts to colleges and other educational institutions, for the advancement of learning or to aid necessitous students in procuring an education, are charitable even if the donee may derive revenue from other investments and from students who are able to pay.   *Mount Hermon Boys' School* v. *Gill*, 145 Mass. 139.   *Dexter* v. *Harvard College*, 176 Mass. 192.   So in *Franklin Square House* v. *Boston*, 188 Mass. 409, and *Thornton* v. *Franklin Square House*, 200 Mass. 465, it was decided, that property, acquired, occupied and used as a home for working girls who paid for fuel, light, food, laundry and domestic services at prices as cheap or cheaper than such accommodations could be obtained elsewhere under similar conditions of respectability and comfort, was held and occupied for charitable uses and exempt from taxation.   The increase of charitable funds, through receipts from patients or inmates who are able to pay wholly or partially for benefits received, does not change a home for aged people, or hospital, organized and conducted as a charity, into a private association, maintained for the pecuniary advantage of the promoters.   The original eleemosynary character of the institution is not transformed by this patronage, even if sufficient to relieve it from financial burdens, but the charity as established remains unaffected.   *Gooch* v. *Association for Relief of Aged Females*, 109 Mass. 558, 567. *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432, 435.   *Thornton* v. *Franklin Square House*, 200 Mass. 465.   *Blake* v. *Mayor of London*, 18 Q. B. D. 437.   *Cawse* v. *Nottingham Lunatic Hospital*, [1891] 1 Q. B. 585, 590, 592.

If, as the commissioner finds, payments were received from patients or patrons who were able to pay the prices charged for food and lodging provided or medical services rendered, he also reports that no part of this revenue was retained for compensation or divided as profits.   It is true, that, while the petitioner, by liberally advertising its attractions as a hospital or sanitarium with its methods of cure and a schedule of prices has succeeded in securing quite an extensive patronage from paying patients,

it has not neglected to apply the income derived from all sources to promote the objects for which it was organized. A bequest to trustees of a fund to be accumulated and administered for the purposes enumerated in the charter would have been valid as a public charity, and as such relieved from taxation. *Saltonstall* v. *Sanders*, 11 Allen, 446. *Minns* v. *Billings*, 183 Mass. 126. *Ould* v. *Washington Hospital for Foundlings*, 95 U. S. 303. *Jones* v. *Habersham*, 107 U. S. 174. *Williston Seminary* v. *County Commissioners*, 147 Mass. 427.

The petitioner's statutory rights are not to be ascertained by an apportionment of the classes who may have been benefited, so that if the number of paying patients preponderates, the exemption fails. The dominant purpose for the promotion of which the institution was organized and has been maintained furnishes the test, whether it is a charity or a business organization conducted for commercial gain with incidental acts of benevolence and philanthropy. To be entitled to the exemption the statute requires that the property not only shall be owned, but must be occupied for the charitable purposes of its incorporation. It was said by Chief Justice Knowlton in *Emerson* v. *Milton Academy*, 185 Mass. 414, 415, " An occupation and use of real estate to produce income to be expended for the purposes for which the institution was incorporated is not within the statute, while an occupation whose dominant purpose is directly to accomplish some one of the objects for which the corporation was established is within it. If incidentally there are results of the use which would not entitle the property to exemption, that is immaterial, so long as the dominant purpose of the occupation is within the statute." If the petitioner had decided to receive only those who were able to pay the charges for what they received until from accumulated profits the institution could be maintained solely for the relief of the poor, while the end to be attained would have been charitable and the same as if the fund so provided had been secured by their voluntary contributions, the real estate during the period of accumulation, although owned, would not have been occupied by it within the meaning of the statute. *Chapel of the Good Shepherd* v. *Boston*, 120 Mass. 212. *Salem Lyceum* v. *Salem*, 154 Mass. 15.

During the years, however, for which a tax has been levied the occupation of the real estate has not been thus limited or restricted. But, having been occupied and used for the administration of the charity for which the petitioner was incorporated, it is entitled to the exemption from taxation provided by the statute, while the personal property, being either a part of the furnishings and equipment of the hospital, or exclusively used in connection with its maintenance, also was exempt. *Mount Hermon Boys' School* v. *Gill*, 145 Mass. 139.

By the terms of the report, judgment is to be entered for the petitioner for the amount of the tax assessed upon its real and personal property, with interest from the dates therein named.

*So ordered.*