BOSTON SYMPHONY ORCHESTRA, INC. *vs.* BOARD OF ASSESSORS OF THE CITY OF BOSTON.

Suffolk.   November 15, 1935. — April 3, 1936.

Present: RUGG, C.J., CROSBY, PIERCE, DONAHUE, & QUA, JJ.

*Tax*, Exemption. *Corporation*, Charitable. *Evidence*, Presumptions and burden of proof.

The burden is upon the claimant of exemption from taxation to show that he is within the terms of the exemption.

A corporation owning Symphony Hall in Boston was *held* not to have sustained the burden of showing itself exempt from taxation of the hall under G. L. (Ter. Ed.) c. 59, § 5, Third, where the facts proved, though showing that its whole income was devoted to the support of musical concerts in the hall and the use of the hall was primarily for that purpose, left it doubtful that the educational benefits of such concerts were received by an indefinite number of people or by the poor as well as the rich, or that its activities lessened the burdens of government, or that the concerts were primarily educational rather than for the entertainment of those attending them.

APPEAL by a taxpayer under G. L. (Ter. Ed.) c. 58A, § 13, filed in the Supreme Judicial Court for the county of Suffolk on August 26, 1935, from a decision by the Board of Tax Appeals.

*B. W. Warren*, (*H. B. Cabot & S. D. Ferguson* with him,) for the taxpayer.

*L. H. Weinstein*, Assistant Corporation Counsel, for the Board of Assessors.

PIERCE, J. This is a petition by the appellant, Boston Symphony Orchestra, Inc., for the abatement of a real property tax assessed by the city of Boston for the year 1934. The appellant contends that the property upon which the tax was levied is exempt as the property of a "literary, benevolent, charitable and scientific" institution within the meaning of G. L. (Ter. Ed.) c. 59, § 5.

The following material facts were found by the Board of Tax Appeals. The Boston Symphony Orchestra was founded in 1881, by the late Henry L. Higginson, as a helpful and beneficial element in the life of a community and an aid to the musical education of the people of Boston, and to foster their appreciation of music. The appellant was incorporated in 1918 for the purpose, as stated in the charter, of "undertaking the further carrying on of a symphony orchestra such as has been carried on during the past thirty-seven years by Henry L. Higginson under the name of the Boston Symphony Orchestra; to maintain a symphony orchestra and give concerts; to promote the enjoyment of music and the rendering of music through concerts, and establish and increase high standards in the rendering of orchestral music and in concerts; to promote musical education and greater public appreciation of music." The orchestra has had an uninterrupted existence for about fifty-four years under various distinguished conductors. It is composed of about one hundred ten musicians, who are engaged under yearly contract, in addition to the conductor. It has an international reputation as one of the greatest orchestras in the world. The corporation has no stockholders, control being vested in a self-perpetuating board of trustees. On March 27, 1934, the corporation

acquired the property in controversy, consisting of land and a building known as Symphony Hall. This building is used by the appellant as a concert hall. There is no other hall in the city of Boston as suitable as Symphony Hall for the purposes of the orchestra, and such a hall is necessary for the orchestra as it is operated at present. During the course of the regular concert season extending over thirty weeks, the orchestra gives four series of concerts, totalling about sixty concerts, together with several other concerts for the benefit of the orchestra's pension fund. Concerts are given also in cities in other parts of the country. At these regular concerts classical music of the highest order is played, including compositions of the world's greatest composers, symphonies, overtures and program music and also the best of modern music. Of the regular concerts one series comprises twenty-four Friday afternoon concerts, and another, twenty-four Saturday evening concerts; the other two series are usually shorter and comprise respectively six Monday evening and six Tuesday afternoon orchestra concerts. In addition to these concerts there are about ninety-nine full orchestra rehearsals in the hall in preparation for the concerts of the regular season, and some choral rehearsals and auditions.

Following the regular symphony season and usually beginning in May, there is given a series of more informal concerts familiarly known as the "Pop" concerts. There are fifty-eight of these given over a period of ten weeks. In addition there are about twenty rehearsals held during the "Pop" concert season. At the "Pop" concerts the music played is lighter in character than that played during the regular season. It frequently contains orchestral arrangements of modern popular music, but much of it is by composers whose works are performed at the regular concerts and it is all good music. The orchestra is smaller, floor seats are removed and tables and chairs are substituted, light refreshments, including sandwiches, soft drinks, beer, and wine are served and smoking is permitted.

Tickets for the regular concerts were offered to the public in the following manner: At the close of each regular season

subscribers for season tickets during that season were given the opportunity before a certain date in May to renew their subscriptions for the same seats for the series of the next season. Prices for season tickets ranged from $25 to $100 for the long series and from $6 to $15 for the short series according to location of the seats. After that season tickets for seats not taken were offered for sale to the public. Tickets unsubscribed for and tickets for particular concerts, returned by subscribers for resale, were placed on sale at the box office and were available to the public at the following prices: for the Friday concerts $2 to $4 each; for the Saturday concerts $2 to $3.50; and for the Monday and Tuesday concerts $1.50 to $3. In addition, for the Friday concerts all the seats in the second balcony back of the second row, two hundred fifty-one in number, were unreserved and were sold to first comers at fifty cents a ticket. These were known as "rush line" seats. At various times and for various regular concerts all available tickets were purchased by the season subscribers, but for all concerts subsequent to 1933 some seats remained unsold. Tickets for the "Pop" concerts were sold separately for each concert and ranged in price from fifty cents to $1. Tickets for the extra concerts, such as pension fund concerts and festivals, were sold only at the box office.

As to free distribution of tickets to students of music the board found that some tickets were purchased by individuals to give to students, some were given by persons who did not care to use their tickets, and that the trustees of the orchestra have a fund of $10,000 given to them in trust to use the income for the purchase of season tickets "to be given to the most talented and deserving music pupils of the New England Conservatory of Music." There was no other distribution of tickets by the appellant directly to students and, except as pointed out above, no effort was made by the appellant to give students, other than those who could afford to pay the price of admission, the benefit of hearing the concerts. During the tax year in question, there was at least one concert in memory of Major Higginson, to which the public was admitted free, and there were

at least two other concerts to which subscribers were admitted without charge. On all other occasions there was a charge for admission.

Subscribers were solicited by advertisements in the programs for regular and "Pop" concerts, notices on bulletin boards at Symphony Hall, newspaper advertisements and communications sent to special groups, such as doctors, teachers and clergymen. "A majority of those who attended were not persons of substantial means."

As to the use of the hall for concerts and other purposes, the board found that over a five-year period the hall was used for concerts one hundred twenty-three to one hundred twenty-nine times a year; that it was used for orchestral rehearsals one hundred thirty-four times each year; and that over the same period it was used for outside rentals from seventy-seven to one hundred forty-five times each year.* Gross revenue obtained from concerts varied from $394,656.89 to $432,480.50, while for the same period revenue from rentals varied from $18,289.22 to $49,945.18, and revenue from advertisements from $24,715.10 to $52,919.27. There has been a substantial deficit from the operation of the orchestra every year since it was first organized. The deficit has been met through the contributions by the public, principally concert-goers, and there is at present a deficit of a few thousand dollars.

On the foregoing facts a majority of the Board of Tax Appeals ruled, as summarized by the appellant, as follows:

---

* The board's finding respecting these "outside rentals" was as follows: "It has been the policy of the management of the orchestra to rent the auditorium to outsiders as much as possible so long as it does not interfere with the occupancy or use by the orchestra with respect to either concerts or rehearsals. The purpose of such renting was stated to be and we find was to reduce the deficit resulting from the operation of the orchestra. The ordinary rental charge for an afternoon or evening is $400, but if it is necessary to remove the orchestra seats as, for instance, when the hall is to be used for dancing, the rent is $650, the extra $250 covering the cost of labor necessary to remove and replace the seats. The expenses directly attributable to a single renting were estimated to be slightly over $100, not including overhead. The hall is available for events of all sorts except theatricals, which are not within the petitioner's license, and sporting events, which the management will not allow. It has been rented for musical recitals, religious services, lectures, conventions, public meetings, dances and other similar events. A relatively few times, the use of the hall for graduations and other meetings of a public character has been allowed at the actual expenses incurred. The superintendent's room is also occasionally rented." — REPORTER.

(1) The appellant is not a charitable corporation exempt from taxation on account of the real estate involved in said cause. (2) The burden of proof was upon the appellant to show that said property was exempt from taxation. (3) The appellant is not an educational institution. (4) The presentation of music by the appellant in the building involved did not constitute education within the meaning of the word "charitable" as used in G. L. c. 59, § 5, Third. (5) Assuming the dominant activities of the appellant bring it within the exempting statute, the benefit of its activities were not extended to the poor as well as to the rich.

The appellant contends that the board should have given the following requested rulings: "1. The Boston Symphony Orchestra, Inc., is a literary, benevolent or charitable institution within the meaning of G. L. (Ter. Ed.) c. 59, § 5. 2. The Boston Symphony Orchestra, Inc., is an educational institution. 3. Symphony Hall is essential to enable Boston Symphony Orchestra, Inc., to accomplish the objects for which it exists. 4. The occupation of Symphony Hall is predominantly by the Boston Symphony Orchestra, Inc., for the purposes for which it is incorporated. 5. The use of Symphony Hall for purposes other than the objects of the Boston Symphony Orchestra, Inc., is incidental to the use for the purposes for which that institution is incorporated."

The appellant states in its brief that its main contentions are (1) that the "appellant Boston Symphony Orchestra, Inc., is a benevolent and charitable institution"; (2) that it "occupies the real estate in question for the purposes for which it was incorporated"; and it is, therefore, exempt from taxes under the provisions of G. L. (Ter. Ed.) c. 59, § 5, Third.

G. L. (Ter. Ed.) c. 59, § 5, reads in part: "The following property . . . shall be exempt from taxation: . . . Third, Personal property of literary, benevolent, charitable and scientific institutions and of temperance societies incorporated in the commonwealth, the real estate owned and occupied by them or their officers for the purposes for which they are incorporated, and real estate purchased by

them with the purpose of removal thereto, until such removal, but not for more than two years after such purchase, except as follows: (a) If any of the income or profits of the business of the institution or corporation is divided among the stockholders or members, or is used or appropriated for other than literary, educational, benevolent, charitable, scientific or religious purposes, its property shall not be exempt." It is conceded that the appellant corporation is not a scientific institution, and there is no contention by the appellant that it is a literary institution in the sense that it affords systematic instruction and training as do colleges and other similar. institutions of learning. No question is raised as to the appellant's ownership of the property, nor as to the fact that it has no stockholders or members among whom its income or profits, if any, could be divided, or that no income and proceeds are appropriated for other than literary, educational, benevolent, charitable, scientific or religious purposes. See *Springfield Young Men's Christian Association* v. *Board of Assessors*, 284 Mass. 1, 8.

We come to the appellant's first contention that it "is a benevolent and charitable institution." An essential of a legal charity is that it should not be a money-making organization. This does not mean that it cannot charge fees, but no profits can be distributed to members or stockholders. *Thornton* v. *Franklin Square House*, 200 Mass. 465. *New England Sanitarium* v. *Stoneham*, 205 Mass. 335. *Springfield Young Men's Christian Association* v. *Board of Assessors*, 284 Mass. 1. Schools and colleges can charge fees and do not thereby cease to be educational institutions provided they are not run for private gain. *Mount Hermon Boys' School* v. *Gill*, 145 Mass. 139, 148. *Dexter* v. *Harvard College*, 176 Mass. 192. *South Lancaster Academy* v. *Lancaster*, 242 Mass. 553. See also as to hospitals *Gooch* v. *Association for Relief of Aged Indigent Females*, 109 Mass. 558; *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432, 435. "A charity, in the legal sense, may be more fully defined as a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or

hearts under the influence of education or religion, by re-
lieving their bodies from disease, suffering or constraint, by
assisting them to establish themselves in life, or by erecting
or maintaining public buildings or works or otherwise lessen-
ing the burdens of government." *Jackson* v. *Phillips,* 14
Allen, 539, 556. As was said in *New England Sanitarium*
v. *Stoneham,* 205 Mass. 335, at page 342: "It is not con-
fined to mere almsgiving or the relief of poverty and distress,
but has a wider signification, which embraces the improve-
ment and promotion of the happiness of man." Under these
definitions the appellant in fulfilling a general purpose to
educate the public in the knowledge of music might well
be considered to be engaged in benevolent or charitable
work even though the main end and result would be an
advancement in broad culture rather than an advancement
in learning of a more specific type. Compare *Massa-
chusetts Society for the Prevention of Cruelty to Animals* v.
*Boston,* 142 Mass. 24, 27; *Molly Varnum Chapter, D. A. R.*
v. *Lowell,* 204 Mass. 487, 493, 494; *Cresson's Appeal,* 30
Penn. St. 437; *Barnes Foundation* v. *Keely,* 314 Penn. St. 112.

In determining whether the property is exempt from
taxation under the statute, it must be established that it is
used directly for the fulfillment of its charitable purposes,
*Burr* v. *Boston,* 208 Mass. 537, 543, such occupancy mean-
ing "something more than that which results from simple
ownership and possession. It signifies an active appropria-
tion to the immediate uses of the charitable cause for which
the owner was organized." *Babcock* v. *Leopold Morse
Home for Infirm Hebrews & Orphanage,* 225 Mass. 418, 421.
Nor is it sufficient that the profits are not shared in by
members of the corporation. *Salem Lyceum* v. *Salem,*
154 Mass. 15, 16, 17.

The way in which the appellant carried out its purpose
by means of concerts in Symphony Hall has features which
differentiate it from other corporations whose profits have
been held to be exempt under the statute. In the first
place, as a result of the system of offering tickets to season
·ticket buyers, who, by renewing their subscriptions could,
and did in the past, purchase all available tickets, other

members of the public could be excluded from hearing most of the regular concerts, even though they were willing to pay the price; and this system is maintained, not because of greater benefit to the season ticket holders, but in order to insure a more stable revenue.   The operation of such a system makes it doubtful that an indefinite number of the public may receive any educational benefits which might accrue from attendance at the concerts.   *Young Men's Protestant Temperance & Benevolent Society* v. *Fall River*, 160 Mass. 409, 411, 412.   *Franklin Square House* v. *Boston*, 188 Mass. 409, 410.   *Little* v. *Newburyport*, 210 Mass. 414, 417, 418.   In the second place, a substantial admission fee is charged at the concerts, and the payment of the price is a general prerequisite to attendance at the concert.   No evidence appears as to the relationship between the prices charged and the cost of providing the concerts, except that no profit has been shown by the appellant.   This makes it doubtful whether the benefits are extended to the poor as well as to the rich.   *Pomfret School* v. *Pomfret*, 105 Conn. 456, 460–461.   *New England Sanitarium* v. *Stoneham*, 205 Mass. 335, 341, 342.   *Little* v. *Newburyport*, 210 Mass. 414, 418.   And it is also doubtful whether the appellant, in return for an exemption, would be giving an equivalent or recompense to the city of Boston in the form of alleviating some burden of government, by conferring benefits which would advance the public interest.   *Molly Varnum Chapter, D. A. R.* v. *Lowell*, 204 Mass. 487, 491, 494.   Compare *Thornton* v. *Franklin Square House*, 200 Mass. 465; *Gooch* v. *Association for Relief of Aged Indigent Females*, 109 Mass. 558, 567; *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432; *Mount Hermon Boys' School* v. *Gill*, 145 Mass. 139.   In the third place, it is at least doubtful whether the method of instruction through the rendering of concerts, and especially of the "Pop" concerts, is such that the property is used primarily for educational purposes, rather than for the purposes of entertainment of listeners, even though it be entertainment of the highest and most beneficial type.   *Boston Lodge Order of Elks* v. *Boston*, 217 Mass. 176, 178.

All the above features cast doubt on whether the appellant is using the property for charitable or benevolent purposes. Any doubt must operate against the one claiming tax exemption, because the burden of proof is upon the one claiming an exemption from taxation to show clearly and unequivocally that he comes within the terms of the exemption. *Boston Society of Redemptorist Fathers* v. *Boston,* 129 Mass. 178, 180. *Boston Lodge Order of Elks* v. *Boston,* 217 Mass. 176, 177. *Milford* v. *County Commissioners,* 213 Mass. 162, 165. *Springfield Young Men's Christian Association* v. *Board of Assessors,* 284 Mass. 1, 5.

Even if the appellant's use of its hall is within the exempting provisions of the statute, the exemption would be lost by reason of the degree of its use by the appellant for non-exempt purposes. The hall was rented out each year to private organizations for various kinds of performances, the number of times being substantial in comparison to the number of times it was used for concert purposes and for rehearsals. The revenue obtained from that source and from advertising in connection with concerts was important and substantial as compared with the revenue received from the concerts. In the circumstances admitted, the non-exempt use was not merely incidental to the other work carried on. *Mount Hermon Boys' School* v. *Gill,* 145 Mass. 139, 149. *South Lancaster Academy* v. *Lancaster,* 242 Mass. 553, 557. The fact that the income thus derived was used for charitable purposes, to carry on which the corporation was organized, does not aid the appellant. *Mount Hermon Boys' School* v. *Gill,* 145 Mass. 139, 149. The substantial use of the property for other than charitable purposes directly connected with the giving of concerts destroys the appellant's claim to an exemption. *Boston Lodge Order of Elks* v. *Boston,* 217 Mass. 176. *Phi Beta Epsilon Corp.* v. *Boston,* 182 Mass. 457. *Salem Lyceum* v. *Salem,* 154 Mass. 15, 16, 17. The rulings requested by the appellant were denied rightly.

*Petition dismissed.*