In the Matter of the Claim of ZADAH GUERIN et al., Respondents. THE NEW OPERA COMPANY, INC., Appellant; EDWARD CORSI, as Industrial Commissioner, Respondent.

Argued March 2, 1948; decided June 11, 1948.

*George Link, Jr.,* and *Charles H. Buckley* for appellant. I. The New Opera Company was organized and operated as an exempt organization — education was its sole purpose. (*Matter of Mergentime,* 129 App. Div. 367, 195 N. Y. 572; *Matter of Moses,* 138 App. Div. 525; *Matter of Hackett,* 133 Misc. 768; *Matter of Rockefeller,* 177 App. Div. 786; *Matter of Mendelsohn,* 262 App. Div. 605, 295 N. Y. 691; *People ex rel. Doctors Hospital, Inc.,* v. *Sexton,* 267 App. Div. 736.) II. The decision of the Appellate Division and of the Unemployment Insurance Appeal Board should be reversed and the exemption granted.

*Leon Lauterstein, Lincoln W. Lauterstein* and *Jacob L. Isaacs* for Metropolitan Opera Association, Inc., *amicus curiæ,* in support of appellant's position. I. The legislative and administrative history of the " educational " exemption in the New York Unemployment Insurance Act and in cognate Federal and State statutes demonstrates that a nonprofit organization for the performance of opera is " educational ". (*Matter of Lazarus [Corsi],* 268 App. Div. 547, 294 N. Y. 613; *People ex rel. Mosbacher* v. *Graves,* 254 App. Div. 438; *Lipstein* v. *Provident Loan Soc.,* 154 App. Div. 732; *Bellegarde* v. *Union Bag & Paper Co.,* 90 App. Div. 577; *Matter of Van Wagenen,* 170 Misc. 820; *Matter of Friefeld,* 168 Misc. 370; *Matter of Moses,* 138 App. Div. 525.) II. The term " educational " has been uniformly construed in cognate Federal and State statutes to include the inculcation of music appreciation and the promotion of the musical arts. ·(*Matter of Mergentime,* 129 App. Div. 367, 195 N. Y. 572; *Matter of Moses,* 138 App. Div. 525; *Matter of Arnot,* 145 App. Div. 708, 203· N. Y. 627; *Matter of Abbe,* 135 Misc. 22;

*Matter of Eastman School of Music,* 31 New York St. Dept. Rep. 91; *Pouch* v. *Prudential Ins. Co.,* 204 N. Y. 281; *Lipstein* v. *Provident Loan Soc.,* 154 App. Div. 732.) III. Administrative and legislative action in New York since the passage of the Unemployment Insurance Law have established and reaffirmed the proposition that the nonprofit presentation of opera is " educational " within the meaning of that act. (*Orinoco Realty Co.* v. *Bandler,* 233 N. Y. 24; *Matter of Gilmore* v. *Preferred Accident Ins. Co.,* 283 N. Y. 92; *Boehm* v. *Commissioner of Internal Revenue,* 326 U. S. 287; *Helvering* v. *Winmill,* 305 U. S. 79.) IV. The constricted scope given to the term " educational " by the Appellate Division and the Appeal Board contravenes the established meaning of the term and thwarts the legislative purpose in granting the educational exemption. (*Matter of Mergentime,* 129 App. Div. 367, 195 N. Y. 572; *Matter of Moses,* 138 App. Div. 525; *Matter of Arnot,* 145 App. Div. 708, 203 N. Y. 627; *Matter of Packard,* 223 App. Div. 491, 251 N. Y. 543; *Matter of Buffalo Turn Verein* v. *Reuling,* 155 Misc. 797.) V. The exemption should be construed to carry out its liberal purpose. (*United States* v. *Proprietors of Social Law Library,* 102 F. 2d 481; *Roche's Beach, Inc.,* v. *Commissioner of Internal Revenue,* 96 F. 2d 776; *Bohemian Gymnastic Assn. Sokol of City of N. Y.* v. *Higgins,* 147 F. 2d 774.)

*Nathaniel L. Goldstein, Attorney-General* (*Francis R. Curran* and *Wendell P. Brown* of counsel), for respondent. I. Appellant was not organized for exclusively educational purposes. (*Matter of De Peyster,* 210 N. Y. 216; *Matter of Beekman,* 232 N. Y. 365; *Matter of Mohawk Mills Assn., Inc.,* 260 App. Div. 433.) II. Appellant is not operated for exclusively educational purposes. (*Matter of Peoples Theatres, Inc.,* 266 App. Div. 694; *Matter of Smith* [*Brooklyn Bar Assn.*], 266 App. Div. 1038, 292 N. Y. 593; *Matter of Henry* [*American Kennel Club*], 269 App. Div. 1; *Matter of Mohawk Mills Assn., Inc.,* 260 App. Div. 433.)

THACHER, J. The claimants, employed by The New Opera Company, Inc., one as a singer and the other as a violinist, claimed benefits under the Unemployment Insurance Law (Labor Law, art. 18). Their claims were allowed by the Unemployment

Insurance Appeal Board and confirmed in the Appellate Division. The question presented is whether the employer is a corporation organized and operated exclusively for literary or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. If it is such a corporation it is not an employer within the meaning of the law (Labor Law, § 560, subd. 4, which before amendment was § 502, subd. 3, par. [d], the language claimed to be applicable in this case appearing in both the original and amended sections).

The New Opera Company was organized in 1941, under the Membership Corporations Law. Its powers and purposes are defined in its certificate of incorporation as follows: " The purposes for which it is to be formed are to cultivate, promote, foster, sponsor and develop the understanding, taste and love of the musical arts, and to lawfully do all and everything necessary, suitable and proper for the attainment of any of the purposes, the accomplishment of any of the objects or the furtherance of any of the powers hereinabove set forth, and to have, enjoy and exercise any and all rights, powers, privileges and exemptions which are now or which may hereafter be conferred upon corporations organized pursuant to the Membership Corporations Law of the State of New York as it now exists or may be amended or supplemented." There is no provision in the certificate for the issuance of any capital stock or the distribution of any profits.

The facts found by the board disclose that The New Opera Company was founded by a group of devotees of music who were concerned with the future of light opera and the plight of young artists in this country. It maintains itself, among other things, by box-office receipts, gifts and contributions, from its sponsors and patrons. On its list of contributors appear the names of well-known patrons of the arts. One of its objects was to give employment to young American artists who were unemployed and to present operas in English at low prices. In view of the fact that this country had only one permanent opera company, the Metropolitan, in New York City, opportunities for graduates of American music schools to further their careers in this country were limited. The employer attempted to develop these potential American artists (par-

ticularly during a period when opera was blacked out in Europe because of the late war) and to popularize opera itself, and to enlarge the repertoire ordinarily available to devotees of opera. During its first season it presented Mozart's " Cosi Fan Tutte ", Offenbach's " La Vie Parisienne ", Tchaikowsky's " Pique Dame " and Verdi's " Macbeth ", the latter being presented in Italian.

One of its aims was to enlarge the audience for operas by presenting opera in a modern manner, freed from the dullness of tradition, with dramatic zest and freshness, so that its qualities as entertainment should be enhanced. It sought to provide a fertile soil for the growth of native singers in operatic works, and maintained a " workshop " to train its singers in stage techniques. All singers who applied were auditioned. A competition was sponsored by the employer for an American one-act opera. Free admissions were given to school children, servicemen, student nurses and the blind. Many of the singers aided by the employer subsequently found employment with outstanding opera companies of this country.

In the fall of 1942, the employer produced the operetta " Rosalinda ". Various persons lent money to the employer for the purpose of financing this production. In this connection it employed an agent to manage and direct the production, who was to make available his office facilities, for which he was to receive $150 per week and an additional salary of $250 weekly. The agreement with the manager further provided that after the setting up of a reserve fund of $15,000 against losses and other contingencies, all profits derived from the production of Rosalinda should be divided weekly by payment of 95% to the employer and 5% to the agent.

In July, 1943, the employer borrowed money from various persons to produce " The Merry Widow " and agreed to repay these loans out of net profits, the agreement providing that after establishing a reserve fund of $15,000, and after repayment of the amounts advanced to the employer, the profits were to be divided equally between the employer and those who had made the advances.

A similar agreement was made in February, 1944, in connection with the production of " Helen Goes to Troy ".

The board and the Appellate Division, feeling constrained by the decision in *Matter of Peoples Theatres, Inc. (Miller)* (266 App. Div. 694), held that the activities of an organization in aiding singers and sponsoring operatic productions are not ordinarily viewed as exclusively educational or charitable.

The law which we are to construe, exempting corporations organized and operated exclusively for educational purposes was first enacted as subdivision 1 of section 502 of the Labor Law (L. 1935, ch. 468, enacted April 25, 1935). The language appears to have been derived from section 360 of the Tax Law, which then provided — and now provides — for deduction from individual net incomes of contributions made to such corporations. The same language then appeared in the Federal income tax laws, providing for deduction of similar contributions (U. S. Code, tit. 26, § 23, subds. [o], [q]), and exempting such corporations from taxation (U. S. Code, tit. 26, § 101, subd. [6]), and was incorporated in the Social Security Act (enacted Aug. 14, 1935, 49 U. S. Stat. 620, 625, 639, 643; now in U. S. Code, tit. 42, § 409, subd. [b], par. [8]; § 1011, subd. [b], par. [8]; § 1107, subd. [c], par. [7]).

A comparable provision (Tax Law, § 4, subd. 6) exempts from taxation " real property of a corporation or association organized exclusively for the moral or mental improvement of men and women, or for * * * educational * * * purposes * * * used exclusively for carrying out thereupon one or more of such purposes." Construing this statute in 1924, prior to the enactment of the statute with which we are here concerned, the State Tax Commission held exempt real property of the Eastman School of Music, a college of the University of Rochester, although the property was used for daily public concerts and motion pictures for which admission was charged. (*Matter of Eastman School of Music*, 31 N. Y. St. Dept. Rep. 91.)

Section 221 of the Tax Law exempts from transfer tax " property devised or bequeathed * * * to any * * * educational * * * corporation ". In *Matter of Mergentime* (129 App. Div. 397, affd. on opinion below 195 N. Y. 572) the Metropolitan Museum of Art was held to be such an exempt corporation. The opinion of the Appellate Division in that case clearly indicated that it was not essential to constitute an

educational corporation that regular corps of teachers with regular classes of students should be furnished, but, on the contrary, that a corporation organized for the purpose of supplying instruction to those who were willing to accept the facilities or opportunities afforded was an educational corporation, and it was held that the Metropolitan Museum of Art, having been incorporated by the Legislature " for the purpose of * * * encouraging and developing the study of the fine arts * * * and to that end * * * of furnishing popular instruction and recreation ", was a corporation the whole object of which was directly connected with higher education.

Similarly in *Matter of Moses* (138 App. Div. 525) the Y.M.C.A. and the Y.W.C.A. were held to be educational corporations within the meaning of the same statute, and in *Matter of Arnot* (145 App. Div. 708, affd. 203 N. Y. 627) it was held that a free art gallery and reference library, directed to be incorporated by a will, was such a corporation. The court rejected the comptroller's contention that the corporation, not being connected with any educational system or school, could not be exempt as an educational institution.

The trend of decisions in other jurisdictions is the same. (*Royal Choral Soc.* v. *Inland Revenue Comrs.,* 169 L. T. 100 [Court of Appeal, 1943]; *Bohemian Gymnastic Assn. Sokol of City of N. Y.* v. *Higgins,* 147 F. 2d 774 [C. C. A. 2d, 1945]; *Oklahoma State Fair and Exposition* v. *Jones,* 44 F. Supp. 630 [W. D. Okla., 1942]; *City Club of Milwaukee* v. *United States,* 46 F. Supp. 673 [E. D. Wis., 1942].) Federal department rulings are in accord with these decisions.

In the light of the authorities, and upon principle as well, we think the Appellate Division was wrong in holding that its own decision in *Matter of Peoples Theatres, Inc.* (*Miller*) (*supra*) required a ruling in this case that the purposes of the corporate employer were not exclusively educational. The fact that Peoples Theatres, Inc., acted as an employment agency for its members is perhaps enough to distinguish the case. But, whether or not distinguishable, we are satisfied that in this case the employer was exempt. We agree, however, with the opinion in the court below that there was no proof that The New Opera Company distributed any of its net earnings to private individuals. The payment to the manager of a

percentage of profits derived from the production of " Rosalinda " under his management contract was compensation for his services which had to be paid before computing net profits of The New Opera Company. The agreements under which " The Merry Widow " and " Helen Goes to Troy " were produced did not provide for the distribution of net profits derived by The New Opera Company to the individuals who financed the productions. On the contrary, The New Opera Company procured others to finance the productions upon agreements under which The New Opera Company took no risk and for its services was entitled to one half of the profits, if any were received. Thus the company retained every dollar it was entitled to receive under the agreements, and the payments made to those who financed the productions were received as repayments of their advances or as their own share of the profits.

The order of the Appellate Division and the decisions of the Unemployment Insurance Appeal Board should be reversed, with costs in all courts and with directions to the Unemployment Insurance Appeal Board to dismiss the claims.

FULD, J. (dissenting). I believe that the claimants, who are employees of The New Opera Company, are entitled to the benefits generally accorded employees by the Unemployment Insurance Law (Labor Law, art. 18, §§ 500–643). I cannot agree with the court's decision that the employer herein is beyond the coverage of that statute.

An employer is exempted from liability for contributions to the State unemployment insurance fund only if " organized and operated exclusively for * * * educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual " (Labor Law, § 560, subd. 4). The record before us establishes that The New Opera Company, competing with indisputably commercial theatrical enterprises, produced operettas and musical comedies for Broadway and on-the-road showing, to which the public were invited upon payment of the usual box-office prices. Profits were realized from two of the company's shows and those profits were divided between the company and individuals who backed the productions. It may well be that this sharing of net earnings, in and of itself, precludes the employer from claiming an exemption.

Be that as it may, however, there was not, in my view, the slightest basis for holding that such a company operated " *exclusively* " for educational purposes, or even that it was operated — exclusively or otherwise — for such purposes.

It is important at the outset to note that this case differs in at least one vital respect from exemption cases arising under most other tax laws. In those situations, granting an exemption involves only reallocating a person's tax burden to countless others; here, however, exemption to appellant means exclusion of its employees from benefits and protection under the Unemployment Insurance Law. (See *City Club of Milwaukee* v. *United States*, 46 F. Supp. 673, 674.) That being so, the Legislature could be expected to award exemptions with a jealous hand, and to insist, in doubtful cases, upon a strict interpretation of the provisions in favor of employees — and that, the statute itself demonstrates, is the fact. Thus, the Unemployment Insurance Law expressly provides that " as a guide to interpretation and application of this article, the public policy of this state is declared to be as follows:  *  *  *  the public good and the well-being of the wage earners of this state require the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own " (Labor Law, § 501). Beyond that, and to check still further all attempts to expand the coverage of the exemption provision, the Legislature added an explicit declaration, in the subdivision immediately following the exemption clause, that " No exemption from taxation granted under any other law of the state shall be so construed as to apply to the payment of contributions under this article " (Labor Law, § 560, subd. 5).

With those general considerations noted, I turn to the facts, to consider, in the first place, whether The New Opera Company was, within the meaning of the Unemployment Insurance Law, organized and operated for " educational " purposes. I would not insist that, in order to qualify under that term, a corporation must dedicate itself to disseminating technical learning by formal means or that " educational " denotes only teacher-pupil systems and classroom methods of instruction. Unless, however, the statutory requirement is to be entirely stripped

of meaning, the activities upon which exemption is predicated must partake of the aspects and methods of education, as these are commonly understood; and entertainment, no matter how artistically or even unprofitably presented, is not thereby rendered educational.

The New Opera Company was formed, the record discloses, under the Membership Corporations Law to " cultivate, promote, foster, sponsor and develop the understanding, taste and love of the musical arts ". These commendable purposes, properly effectuated, might accomplish educational ends.

In the beginning, serious musical works, including some operas which theretofore had been only infrequently heard, were presented. However, as its officers testified, they were not sufficiently income producing and failed to satisfy the company's financial needs. A new policy was adopted. Under the sponsorship of the company, and in joint venture with profit-seeking investors active in the commercial theatre, operettas such as " The Merry Widow " and " Helen Goes to Troy " were produced. Well-known musical comedy stars filled leading roles — concededly as box-office attractions — at prices scaled according to commercial theatre rates. Typical advertising and press agent promotion were employed, in direct competition with commercial theatres. There was at no time any general reduction of admission prices to make the performances more available to the public. Whether or no the company's other activities could be regarded as educational under the statute — and I am of the opinion they were not — these two presentations were concededly not educational. The company itself recognized that they would " not be educational for school children " because of the ideas contained in them.

Even as to the more serious operas, available only to small numbers of the public on payment of commercial theatre admission fees, it seems clear that they were in the field of entertainment rather than in that of education. (See *Boston Symphony Orchestra, Inc.*, v. *Board of Assessors of City of Boston*, 294 Mass. 248, 256.) In the *Boston Symphony Orchestra* case (*supra*), the Massachusetts Supreme Judicial Court rejected the claim of the Boston Symphony to exemption from city property taxes, though there the statutory exemption was

couched in broader language than the provisions here involved. Pointing out that the " way in which the appellant [the corporation] carried out its purpose " — by sale of season subscriptions " to insure a more stable revenue " — and the charging of " a substantial admission fee " made " it doubtful whether the benefits are extended to the poor as well as to the rich ", the court went on to say that " it is at least doubtful whether the method of instruction through the rendering of concerts, and especially of the ' Pop ' concerts, is such that the property is used primarily for educational purposes, rather than for the purposes of entertainment of listeners, even though it be entertainment of the highest and most beneficial type " (294 Mass., at pp. 255, 256).

I believe it even more clear here than in the *Boston Symphony Orchestra* case (*supra*) that whatever educational benefits may be present are realized only as a by-product of entertainment. Thus, it appeared at the hearing that there was no organized schooling, instruction or training for performers other than the usual coaching incidental to preparation of any dramatic or musical performance. There were no "students" in the company; most of the performers selected for parts were music school graduates, and many of them were professionals. I perceive no great distinction between the type of program presented and the activities conducted by The New Opera Company, and the programs and the activities of innumerable ballet, theatre and motion-picture groups. In my judgment, the company was not organized or operated for " educational " purposes.

Even if I could persuade myself that the production of operettas and musical comedies in competition with the commercial theatre is " educational " under the Unemployment Insurance Law, I find no possible escape from the conclusion that the producer, The New Opera Company, is not operated " *exclusively* " for such educational purposes.

The statute demands — as a prerequisite to exemption — not simply that the company's activities be for educational purposes, but that they be " exclusively " so By the provision in question, the Legislature undoubtedly sought to guard against abuses which might arise if a charitable or educational corporation were tempted and permitted to undertake commercial nonexempt ventures in the hope of increasing its funds for

promotion of its exempt purposes. (See *People ex rel. Young Men's Assn.* v. *Sayles,* 32 App. Div. 197, affd. on opinion below 157 N. Y. 677; *Board of Foreign Missions* v. *Board of Assessors,* 244 N. Y. 42, 46.)

It cannot be said that such fears are unfounded. The record before us, for instance, demonstrates that The New Opera Company did not operate " exclusively " for educational ends. First, it was conceded that two of its productions — " The Merry Widow " and " Helen Goes to Troy " — did not effectuate the avowed educational objectives. Second, the company itself recognized that these productions were not entitled to exemption as educational by actually paying statutory contributions to the Unemployment Insurance Fund on their proceeds, without claiming exemption. Here was clear acknowledgment that the company engaged in nonexempt activities and earned profits from nonexempt productions. The mere circumstance that it made insurance fund contributions on such proceeds cannot be utilized and does not serve to insulate the rest of its operations and preserve the company's exempt status. If anything is clear, it is that the statute requires that, if the corporation is to escape liability for unemployment insurance contributions, *all* of its activities must be of the exempt class.

A contrary contention — in a case where exemption was sought from liability for real property taxes — was rejected in the *Sayles* case (*supra*). There, the Appellate Division, in an opinion adopted by this court, declared, " we are asked to hold that, because the rentals of the commercial portions of this building are applied to the expenses of the benevolent objects promoted in the other portion, therefore, in effect, the whole building is exclusively used for benevolent purposes, and for none other. In our view the statute does not permit us this pleasure " (32 App. Div., at p. 200). No more does the Unemployment Insurance Law permit us here to say that a company which carries on concededly noneducational and nonexempt operations in competition with the commercial theatre is, nevertheless, " exclusively " operated for educational purposes.

In reaching this conclusion, I have put aside the circumstance that the determination made by the Unemployment Insurance Appeal Board, based upon questions of fact and having reasonable and substantial support in the record, is not subject to

court review. (See *Matter of Miller . v. Kling,* 291 N. Y. 65; cf. *Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104, 108.)

The order of the Appellate Division should be affirmed.

LOUGHRAN, Ch. J., LEWIS and CONWAY, JJ., concur with THACHER, J.; FULD, J., dissents in opinion in which DESMOND and DYE, JJ., concur.

Order reversed, etc.