STATE TAX COMMISSION OF MARYLAND *v.*
WHITEHALL FOUNDATION, INC.

[No. 3, September Term, 1957.]

*Decided October 16, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Theodore C. Waters, Jr., Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellant.

*Howard Wood* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The State Tax Commission in 1955 assessed Whitehall Foundation, Inc., (which in *Coursey v. Hanover Bank,* 206 Md. 180, was held to be exempt from Maryland inheritance taxes as an organization operated exclusively for charitable, scientific and educational purposes) upon its tangible personal property on a fourteen hundred acre farm in Queen Anne's County known as Blakeford Farms, on which it conducted

long range scientific experiments and research in the inbreeding of livestock. The Circuit Court for Queen Anne's County abated the assessment on the ground that the Foundation, its activities at Blakeford Farms, and the personal property used in those activities were exempt by statute. The Commission appeals.

Code, 1951, Art. 81, Sec. 8, grants various exemptions from assessment and taxation and directs that all such exemptions are to be strictly construed. If no part of the net income inures to the benefit of any private shareholder or individual, exemption is granted by subsections (7) and (8) to the equipment and furniture of charitable and of educational institutions respectively. The Commission argues that the strict construction required by the statute does not permit (a) an exemption as charitable or educational of the personal property of a non-profit organization which conducts scientific experiments in the inbreeding of livestock, or (b) the reading of the word "equipment" as including livestock.

The story of Whitehall Foundation, Inc., is set forth in *Coursey v. Hanover Bank,* to which we have referred. Suffice it to say that it was established in 1937 by the late George Moffett, a wealthy man who contributed substantial sums to it during his lifetime. Corporate purposes, as set forth in the charter, are to give aid to those in need, to lend money for educational purposes, and to give financial aid to charitable, benevolent or educational organizations or agencies, either directly or through any charitable medium selected by the governing body, the trustees. It is conceded that the Foundation is a non-profit corporation, that no part of its income inures to the benefit of any shareholder or individual and that no part of its property is commercially rented. It is exempt from Federal and Maryland income taxes and is qualified to receive non-taxable gifts. Since its incorporation, the Foundation has given away for charitable purposes well over one million dollars for scholarships, research, and for the general corporate purposes of many charitable institutions and organizations.

Mr. Moffett bought Blakeford Farms in 1935. He was interested in agriculture and was fully familiar with the progress

that had resulted from experiments with hybrid corn. He believed that by following the same general principles in the inbreeding of dairy cattle for many generations with careful and scientific selection for types, the finest characteristics of the breed could be brought to a permanently higher plane and the undesirable features eliminated. He embarked on the experiment and conducted it at Blakeford Farms until his death in 1951, operating through a wholly owned corporation. Knowing that the experiment must continue for many years without regard to economic results, if it was to be meaningful, Mr. Moffett left the farm and the capital stock of the corporation, as well as the rest and residue of his large estate, to Whitehall Foundation, Inc. Pursuant to the directions of his will, the Foundation took over the experiments immediately upon his death and has continued them since, first operating the farm through the corporation and later directly.

The experiments at Blakeford Farms were primarily with Guernsey cattle. However, several new breeds of hogs have been developed there. In cooperation with the University of Maryland and the Bureau of Animal Industry of the United States Department of Agriculture, there was developed a new prize-winning hog known as "Maryland No. 1". The Department of Agriculture issued a bulletin on this development which said: "The history of the development of this breed is unique in that all the resources in land, equipment, breeding animals and the necessary funds were placed at the disposal of the cooperative agencies by a private organization."

The record in this appeal and that in the *Coursey* appeal reveal that the experiments during Mr. Moffett's lifetime were conducted with the cooperation and assistance of the University of Maryland, University of Wisconsin, Ohio State University, Iowa State College and the American Guernsey Cattle Club. Dr. Gordon M. Cairns, Dean of Agriculture at the University of Maryland, and former head of its Dairy Department as well as the former head of the Department of Animal Industry at the University of Maine, said that he had many times consulted with and assisted the farm manager at Blakeford in the inbreeding program and that consultations had been held with experts from other State universities and

the American Guernsey Cattle Club. He pointed out that the inbreeding experiments were conducted entirely from a scientific point of view and for the purpose of benefiting the dairy industry. He called the Guernsey cattle project "unique in this country" and said that the full results of the experiments would materially add to the knowledge on the subject. He added that "the benefits will be reflected over a long period of time." He went on to say that "The University of Maryland is very much interested in the continuation of the project. Since in my opinion, a sound foundation has been established, it would be most unfortunate if further work is not done. Because of this, the University of Maryland will cooperate to the extent of its ability in supplying any technical assistance and advice that may be requested in carrying this program to a successful conclusion."

After Mr. Moffett's death a committee of experts was named to supervise and make reports on the Guernsey breeding experiments. Its chairman was Dr. Cairns, and the other members were the Professor and Associate Chairman of Dairy Science at the Ohio Agricultural Experimental Station, and the Professor of Dairy Husbandry at Michigan State College. Their report was that a wealth of useful information had been made available from the experiments and that its "analysis would contribute materially to the knowledge and help to guide the thinking of all dairy cattle breeders." It was shown that a number of articles on the work that had been and was being done at Blakeford Farms had been published in trade and technical publications.

The State Tax Commission's argument that tax exemption must be strictly construed is sound. This Court has said often that to doubt is to deny an exemption. Thus the statute's direction in Code, 1951, Art. 81, Sec. 8, is declaratory of the law. Nevertheless, strict construction does not require that an unreasonable or unusual meaning must be given to the words used in exemption statutes. We find nothing to show that the words "charitable" and "educational" were intended by the Legislature to have and convey other than their usual meaning in law.

Considering only the activities of Whitehall Foundation,

Inc., at Blakeford Farms, and reading the words of the statute as having their usual legal meaning, we think that those activities are charitable and educational. *Rabinowitz v. Wollman,* 174 Md. 6, shows the breadth, in the legal sense, of charitable purposes. This breadth is reiterated in *Restatement, Trusts,* cited, relied on in the *Rabinowitz* case. Sec. 368 *b* says: *"The nature of charitable purposes.* A purpose is charitable if its accomplishment is of such social interest to the community as to justify permitting the property to be devoted to the purpose in perpetuity. There is no fixed standard to determine what purposes are of such social interest to the community; the interests of the community vary with time and place. At common law in England and in the United States it is agreed that the relief of poverty, the advancement of education and of religion, the promotion of health, the accomplishment of governmental or municipal purposes, are of such social interest to the community as to fall within the concept of charity. As to what other purposes are of such interest to the community as to be charitable, no definite rule can be laid down. These various purposes are dealt with in the following Sections." Section 370 says: "A trust for the advancement of education is charitable", and in Comment *a* points out some of the methods of advancing education: "to promote the advancement of knowledge by research; to promote the dissemination of knowledge or of beliefs by the publication of books and pamphlets or the delivery of lectures." In *Rotch v. Emerson,* 105 Mass. 431, 433, a gift to trustees to be applied to "agricultural or horticultural improvements" was held to be a charitable bequest. The Court said: "We must infer, therefore, that by the 'promotion of agricultural or horticultural improvements,' the testator had in his mind the acquisition and dissemination of knowledge, the study and inculcation of principles affecting those departments of industry, or of sciences relating thereto." In *Mitchell v. Reeves* (Conn.), 196 A. 785, 788, Chief Justice Maltbie said for the Court: "An organization or trust devoted to scientific purposes may well serve to make available the results of scientific study and research which are capable of ministering to the well-being of society, and are often of a nature which cannot be

carried on with a view to any financial return upon the necessary expenditure. A fund devoted to such purposes falls within the field of charitable uses." In the case of *In re Frasch's Will* (N. Y.), 156 N. E. 656, 658, Judge Lehman held for the unanimous Court, including Chief Judge Cardozo, that a trust, the income from which was to be paid to institutions upon the condition that they agree to devote the money received to "research" in the field of agricultural chemistry with the object of attaining results of practical benefit to the agricultural development of the United States, was a charitable trust. The Court said: "Research is the method used by modern universities and scientific foundations to increase the sum of human knowledge. Research conducted for such purpose and by such institutions is clearly 'educational' and 'benevolent' within the meaning of the statute. * * * Conceptions of public charity, benevolence, and education change with the passing generations. When the courts are called upon to give effect to a statute covering trust to 'religious, educational, charitable or benevolent uses,' they construe those words as including at least those uses which prevailing conceptions bring within the spirit of the statute of Elizabeth." See *Lackland v. Walker* (Mo.), 52 S. W. 414, 418, in which a devise of a botanical garden and a museum and library to be devoted to the science of botany, horticulture and allied subjects for the benefit of the public, and a bequest to be used by Washington University for "scientific investigations in botany proper, in vegetable physiology, the diseases of plants, the study of the forms of vegetable life and of animal life injurious to vegetation, experimental investigations in horticulture, arboriculture, etc.," were held to create charitable trusts of the most unimpeachable character. See also *Board of Assessors v. Garland School of Home Making* (Mass.), 6 N. E. 2d 374, 381.

It is our view that the activities carried on at Blakeford Farms by the Whitehall Foundation, Inc., are charitable and educational in the legal meaning of the words and make the Foundation an exempt institution within the intent of the statute. Certainly the records make it plain that the details of the research carried on and the results obtained are widely

disseminated among interested universities and State agricultural authorities, as well as among the dairy industry of the United States. That the experiments are scientific in nature has been held in *Coursey v. Hanover Bank, supra,* and is demonstrated by the record. The experiments are comparable to research carried on under grants at universities and add to the dissemination and general store of scientific knowledge.

That the performance of the experiments requires the Foundation to sell much of the livestock from time to time on the open market, as well as some of the grain and farm products, does not change the fact that the work is essentially charitable and educational. Non-profit hospitals that charge patients for room and board, for medicine and medical and diagnostic services do not lose their status as charitable organizations because the receipts are used for the further care and cure of patients needing medical or surgical help. *Glass v. Doctors Hospital,* 213 Md. 44, 54; *Restatement, Trusts,* Sec. 372, Comment *b,* and Sec. 376, Comments *c* and *d.* The test is well set forth in *Mt. Hermon Boys' School v. Town of Gill* (Mass.), 13 N. E. 354, 358. There an institution incorporated to furnish to boys practical education in agriculture was held to be a charity that properly could (a) maintain a farm and farm houses, and keep livestock, and (b) sell for cash some of the livestock without subjecting its property to taxation. The Court said: "It seems to us that the farm, and the property upon it, were used in the legitimate management of the school, to directly accomplish its purposes, and not to obtain money for subsequent use in accomplishing them. The fact that products were sold is a circumstance important only so far as it characterizes the use. We think the sales were merely incidental to a use for the purposes of the institution. If certain valuable chemicals are produced in a school by practical instruction in chemistry, and are subsequently sold instead of being wasted, that does not change the character of the use of the apparatus, and the original ingredients employed. And, if a farm is set apart and cultivated to supply food for a family or community, it does not cease to be used for that purpose because in the economical

management of it there are certain products which cannot be utilized otherwise than by sale."

It was held in *Appeal Tax Court v. St. Mary's Seminary*, 50 Md. 343, that three milk cows owned by the Seminary were not part of the "equipment" of the Seminary entitled to exemption from taxation. We find the circumstances in the case before us so different that the *St. Mary's* case is not controlling. The lower court in his opinion said: "Webster defines 'equipment' as 'whatever is used in equipping,' and 'equip' as 'to supply whatever is necessary to efficient action in any way.' It is irrefutable that livestock in large quantities, both grade and registered, are necessary to the efficient operation of the Blakeford program." We agree, feeling indeed that the livestock is the essence of the charitable and educational work that was conducted at Blakeford and, although the term "equipment" generally would not include livestock, that under the facts here, the very purpose of the exemption statute would be defeated if it did not. In *Dairy Co. v. Wrecking Co.*, 146 Md. 318, 321, where a vendor reserved the right to remove from the real property sold "* * * 'all machinery and equipment located therein' ", the Court took a broad view of "equipment", holding that "Anything provided for efficient service in the dairy business, as conducted on the premises of the appellant that were sold * * *, would be included in the term 'equipment' as used in the contracts in this case. It, therefore, would include fixtures." Our opinion that in this case the term "equipment" includes livestock is not without judicial support. In *Polliak v. Smith* (Super. Ct. N. J.), 88 A. 2d 351, 353, a testatrix gave a dairy farm to her two children and its machinery and "equipment" to one of them. The Court, holding that the word "equipment" means that which is needful and necessary for a successful undertaking and that "In the operation of a dairy farm for the production of milk, cows and hay are not only needful and necessary but are indispensable", determined that the livestock went to the son as part of the equipment of the farm. In *Rubey v. Coal and Mining Co.*, 21 Mo. App. 159, the Court held that "equipment" includes any necessary adjunct and that "equipment" of a coal mine includes as a part of its necessary adjuncts the

pit mules which are an essential part of its function and without which it cannot operate. The mules were held to pass under a chattel mortgage of the mine equipment.

We do not reach the other points raised and decided below under the disposition we have made of the case.

*Order affirmed, with costs.*